# In the United States Court of Federal Claims

No. 21-775C

(Filed Under Seal:  August 2, 2021)

(Reissued:  August 16, 2021)

|  |  |
|---|---|
| **OAK GROVE TECHNOLOGIES, LLC,** | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
| **THE UNITED STATES,** | ) |
| *Defendant,* | ) |
| **and** | ) |
| **F3EA, INC.,** | ) |
| *Defendant-Intervenor.* | ) |

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Plaintiff. With him on the briefs were *Thomas A. Pettit* and *Anna L. Dykema*.

*Joseph A. Pixley*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and *Harry Parent*, Contract & Fiscal Law Division, United States Army Legal Services Agency, Fort Belvoir, VA.

*Joshua A. Mullen*, Baker Donelson Bearman Caldwell & Berkowitz, PC, Nashville, TN, for Defendant-Intervenor.  With him on the briefs was *Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, WA.

## OPINION AND ORDER

**SOLOMSON**, **Judge.**

The work of our nation's esteemed special forces is quite understandably shrouded in secrecy. In contrast, the Federal Acquisition Regulation ("FAR") requires our procurement system to be open and transparent. The problem in this case is that the government treated a procurement to support the special forces – and conducted this extended bid protest litigation – as if both were clandestine missions. The result is a procurement record that raises more questions than it answers. Indeed, the administrative record demonstrates, if anything, that Plaintiff, Oak Grove Technologies, Inc. ("OGT"), was not treated with the fairness the FAR requires. Moreover, the Court has serious doubts about the integrity with which the procurement at issue was conducted.

In particular, in this post-award bid protest, OGT challenges the decision of Defendant, the United States, acting by and through the Department of the Army ("Army" or the "Agency"), to award the Special Operations Forces Requirements Analysis, Prototyping, Training, Operations and Rehearsal IV ("SOF RAPTOR IV") contract to Defendant-Intervenor, F3EA, Inc. ("F3EA"). OGT contests that award as arbitrary, capricious, and otherwise not in accordance with law, including provisions of the FAR. The parties filed motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). The government also moved to dismiss OGT's complaint for lack of standing pursuant to RCFC 12(b)(1).

For the reasons explained below, the Court **DENIES** the government's motion to dismiss, **GRANTS** OGT's motion for judgment on the administrative record, and **DENIES** the government's and the defendant-intervenor's respective cross-motions for judgment on the administrative record. As a result, the Agency must fix this procurement.[*]

---

[*] On August 2, 2021, the Court filed, under seal, this opinion and order and provided the parties the opportunity to propose redactions. On August 16, 2021, the parties filed joint proposed redactions, ECF No. 72, which this Court adopts, in part, and accordingly reissues this public version of this opinion and order. Redacted information is noted with [*  *  *] and redacted names are noted with bracketed initials.

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.      The Solicitation

For years, the Army has utilized SOF RAPTOR contract vehicles for procuring training services for the United States Special Operations Command ("USSOCOM") and its component Special Operations Force ("SOF") commands.  AR 1719.  SOF RAPTOR provides USSOCOM with a "flexible contract vehicle capable of executing complex Full Mission Profile (FMP) exercises and rapid technology insertions" to assist with "conduct[ing] training, mission planning, preview, and rehearsal using a mix of live, virtual, and constructive simulation applications."  *Id.*  SOF RAPTOR III, the predecessor contract to the one at issue here, was awarded to a joint venture, Raptor Training Services, LLC, of which OGT and F3EA were both members.  AR 3380.  With SOF RAPTOR III set to expire, the Army issued, on October 30, 2018, Solicitation No. W900KK-19-R-0078, as a Request for Proposals (the "Solicitation" or the "RFP") for SOF RAPTOR IV.  AR 1651, 1719.  SOF RAPTOR IV is a 100% service disabled veteran owned small business ("SDVOSB") set-aside, providing for a single-award indefinite delivery indefinite quantity ("IDIQ") contract, with an order ceiling of $245,000,000.  AR 1651-52, 1693.  SOF RAPTOR IV contemplates a five-year base period and two, one-year option periods.  AR 1687.  Proposals were due December 14, 2018.  AR 2576.

The RFP instructed offerors to submit proposals consisting of four volumes addressing different subjects:  (1) capability; (2) past performance; (3) cost/price; and (4) administrative.  AR 1695 (§ L.3.1).  The RFP cautioned offerors that "[p]roposals shall be compliant with the full solicitation" and that failure to comply with solicitation requirements "may cause the proposal to be evaluated as non-compliant and ineligible for award."  AR 1693 (§ L.1.7).  The RFP emphasized, again, that "[f]ailure of an offeror to provide all requested proposal information may render the offeror's proposal as non-compliant and, as such, the offeror's proposal will not be evaluated," subject to the Procuring Contracting Officer's ("PCO") "sole discretion."  AR 1695 (§ L.3.1).

The RFP required a FAR Part 15 "Best Value Subjective Tradeoff Process" with the caveat that "[a]ward may be made to other than the lowest priced Offeror or other than the highest technically rated Offeror."  AR 1708 (§ M.2).  The RFP informed offerors that the Army "does not intend to hold discussions, but reserves the right to do so, at the sole discretion of the PCO."  AR 1708 (§ M.1.5).  The RFP provided that the

---

[1] This background section constitutes the Court's findings of fact drawn from the administrative record.  *See infra* Section III.  Citations to the administrative record (ECF No. 23, as amended by ECF Nos. 49, 56, 59, 65) are denoted as "AR".

capability, past performance, and cost/price volumes would be evaluated in descending order of importance, and that "[a]ll non-price evaluation factors, when combined, are significantly more important" than cost/price.  AR 1709 (§ M.3.1).  While Section L contained detailed requirements for the administrative volume, the RFP did not provide Section M evaluation criteria specifically for that volume.  *See id.*

### 1.  Capability Volume

In the capability volume, offerors were required to address three technical subfactors:  program management, crisis response force, and core competencies.  AR 1697–1700 (§ L.4.0); *see also* AR 1709 (§ M.3.1).

Under the program management subfactor, offerors were required to demonstrate the ability to efficiently address four separate areas:  exercise management, management structure, personnel management, and a program management setup plan.  AR 1697–98 (§ L.4.1).  For exercise management, offerors were required to submit a Realistic Military Training ("RMT") packet and an After Action Review ("AAR") "from the same exercise."  AR 1697 (§ L.4.1.1).  The purpose of this requirement was for the Army to evaluate "the Offeror's ability to execute complex pre-exercise coordination and post-exercise activities."  AR 1709 (§ M.4.1.1.1).  Within management structure, offerors were required to "identify all teaming arrangements, partnerships, joint venture ownership and contingencies, as applicable, within this description."  AR 1697 (§ L.4.1.2).  The Army evaluated the "soundness and completeness" of the offeror's approach to each of the four areas within the program management subfactor.  AR 1709 (§ M.4.1.1).

The crisis response subfactor required offerors to demonstrate their approach to a sample task order ("STO") for supporting a Crisis Response Force ("CRF"), AR 1698 (§ L.4.2), referred to as STO-1.  AR 1259.  In evaluating an offeror's approach to STO-1, the Army focused on six equally weighted elements: logical structure, command structure replication, scenario, intel, logistics plan, and personnel support.  AR 1710 (§ M.4.1.2), 3391.

For the core competencies subfactor, offerors were required to submit an approach for three different STOs:  Unconventional Warfare Exercise ("UWEX"), Special Activities ("SA"), and Next Generation Soldier Tracking System ("NGSTS"), AR 1698–1700 (§§ L.4.2–L.4.3), referred to as STO-2, STO-3, and STO-4, respectively.  AR 1259.  The Army assessed the offeror's approach to STO-2 and STO-3 with the same six equally weighted elements as STO-1, while STO-4 was evaluated for technical, capability, form, fit, function, and network.  AR 1711–12 (§§ M.4.1.2–M.4.1.3), 3396.

4

The Agency evaluated the program management, crisis response, and core competencies subfactors in descending order of importance.  AR 1709 (§ M.3.1).  For each of those technical subfactors, offerors were adjectivally rated as "outstanding," "good," "acceptable," "marginal," or "unacceptable."  AR 1715 (§ M.5.1).  These ratings were based on the aggregate assessment of an offeror's strengths, weaknesses, and deficiencies.  AR 1709, 1716 (§§ M.4.1,  M.5.4).  A rating of less than "acceptable" (*i.e.*, either "marginal" or "unacceptable") for any of the subfactors resulted in an "unacceptable" rating for the overall capability evaluation factor.  AR 1709 (§ M.3.1).

### 2.  Past Performance Volume

The RFP required that proposals contain relevant past performance information to demonstrate an offeror's ability to successfully perform task orders similar to the planned SOF RAPTOR IV task orders.  AR 1700 (§ L.5).  Each offeror was permitted to submit a maximum of five prior contract references on which it was the prime contractor, as well as an additional four contract references for any subcontractor "that the bidder deems necessary to demonstrate their *team approach* to substantiate this solicitation's requirements."  AR 1700 (§ L.5) (emphasis added).  Offerors were further required to submit a narrative explanation and a completed past performance questionnaire ("PPQ") for each contract reference.  AR 1701 (§§ L.5.2–L.5.3).  Past performance was adjectivally rated for relevancy ("very relevant," "relevant," "somewhat relevant," and "not relevant") and confidence ("substantial confidence," "satisfactory confidence," "neutral confidence," "limited confidence," and "no confidence").  AR 1715–16 (§§ M.5.2–M.5.3).

### 3.  Cost/Price Volume

The RFP required offerors to submit a total evaluated price ("TEP") and cost workbooks, including proposed labor rates.  AR 1702-04 (§ L.6.0).  The Army evaluated an offeror's price and cost proposals, respectively, for reasonableness and realism.  AR 1713–14 (§ M.4.3).  The RFP provided that "[a]s part of this evaluation, the Government may consider DCMA and DCAA audit information and other information the Government deems relevant."[2]  AR 1714 (§ M.4.3.4).  To determine financial responsibility, the RFP specified that "DCAA *will* . . . perform a Financial Capability Risk Assessment for the Prime offeror . . . [and t]he Prime offeror *must be deemed*

---

[2] "DCMA" refers to the "Defense Contract Management Agency" and "DCAA" refers to the "Defense Contract Audit Agency."

*financially responsible* by the Contracting Officer *based on* the Financial Capability Risk Assessment." AR 1714 (§ M.4.3.7) (emphasis added).

### 4. Administrative Volume

The RFP instructed offerors, with regard to contents of the administrative volume, to include, among other things, "all executed teaming arrangements, partnerships, joint venture ownership documentation, associate contractor agreement and contingencies, as applicable." AR 1706 (§ L.7.7). The RFP added that "any previous teaming arrangements . . . that [are] referenced within the proposal *shall* be included as attachments in the admin volume *as supporting documentation*." *Id.* (emphasis added) The RFP acknowledged, however, "that companies are not locked into any teaming arrangement or subcontractors for future work under SOF RAPTOR IV." AR 1706 (§ L.7.7.1).

### C. The RFP's Evaluation Process

The Agency initially screened proposals to ensure that all offerors submitted the necessary information per the RFP's requirements. AR 1626. Source selection evaluation board ("SSEB") teams were assigned to evaluate and rate proposals. AR 1627. Specifically, [ZH] supported capability evaluations and [MD] evaluated capability and past performance. AR 1631. Two non-government advisors with subject-matter expertise, [JL] and [GH], assisted government officials with the capability volume evaluations. AR 1622, 1631. The individual evaluators or teams forwarded recommendations to the respective chairperson for each team assigned to an evaluated factor – *i.e.*, capability, past performance, and cost/price. AR 1627, 1631. As relevant for this case, [JS] was the capability factor chairperson. AR 1631. The chairpersons then transmitted their reports to [RM], the overall SSEB Chair. AR 1627, 1631. SSEB Chair [RM] was responsible for preparing a comprehensive and accurate proposal evaluation report ("PER"). The PER contained "the adjectival assessments for each factor and subfactor as well as a Cost/Price report and the supporting rationale." AR 1627. He provided the PER to the source selection advisory council ("SSAC"), which, in turn, provided the source selection authority ("SSA") with a source selection decision recommendation. AR 1628. This source selection team structure and the identities of its members were not made publicly available to any of the offerors. AR 1629.[3]

---

[3] Of note, neither the Court nor OGT learned the truth about [RM's] role in the procurement at issue until late in this litigation.

### D.     The Contract Awards and GAO Protest History

On December 14, 2018, OGT, a Raleigh, North Carolina-based SDVOSB, timely submitted its proposal.  AR 2576.  Nine other SDVOSB offerors, including F3EA and Lukos-VATC JV III, LLC ("Lukos"), also submitted timely proposals.  AR 3375.[4]

On January 15, 2020, the Army awarded SOF RAPTOR IV to F3EA.  AR 70. F3EA was evaluated as the offeror with the highest technical rating and lowest price of the three proposals that received an acceptable (or greater) capability rating.  AR 3386–87.  The Agency rated F3EA as "outstanding" in each capability subfactor and assigned a "very relevant/substantial confidence" rating for past performance.  AR 3386.  The Agency rated the capability volumes of the remaining seven offerors' proposals, including that of OGT, as either marginal or unacceptable, thus rendering their proposals unawardable pursuant to Section M.3.1 of the RFP.  *Id.*  That same day, the Agency transmitted a letter to OGT, informing it that the Agency decided to award the contract to F3EA.  AR 2111–12.

On January 28, 2020, OGT filed a protest with the Government Accountability Office ("GAO"), raising numerous challenges to the Agency's evaluation of OGT's capability and past performance volumes and to the Agency's decision to award a contract to F3EA.  AR 6.  Among other grounds, OGT alleged that F3EA improperly benefited from unequal access to information and biased ground rules, thus resulting in a prohibited organizational conflict of interest ("OCI").[5]  AR 6–347.  In support of those serious allegations, OGT submitted two emails that it received from former F3EA employees.  AR 2312, 2386–87.  In those emails, the former F3EA employees alleged not only that they overheard conversations between F3EA's [*  *  *], and a government point of contact named "[RM]" regarding "the intent for F3EA to get the work" but also that [RM] steered the contract award to F3EA by deliberately selecting three STOs for the capability factor evaluation (STO-1, STO-2, and STO-3) that were very similar to certain task orders that F3EA had performed under the predecessor SOF RAPTOR III

---

[4] In many of the administrative record documents, the various offerors are referred to by a single letter.  *See, e.g.*, AR 3350.  For example, OGT is "Offeror B," F3EA is "Offeror E," and Lukos is " Offeror H."

[5] In January 2020, OGT also filed a size protest with the Small Business Administration ("SBA"), contesting F3EA's classification as small under the applicable size determination for SOF RAPTOR IV, which protest the SBA Area Office denied in a decision that the SBA Office of Hearings and Appeals ultimately affirmed.  *Oak Grove Tech., LLC*, SBA No. SIZ-6051, 2020 WL 2107083 (Apr. 20, 2020).

contract.  AR 25–26 (internal quotation marks omitted).[6]  The former F3EA employees also alleged that F3EA had a role in actually drafting the STOs.  *Id.*  On January 29, 2020, based on the same allegations contained in OGT's GAO protest, OGT sent a notice of possible Procurement Integrity Act ("PIA") violations to the cognizant PCO.  AR 854–55.

On January 31, 2020, the Army issued a notice of corrective action, representing to GAO, in relevant part, as follows:

> The Army *will reevaluate proposals* consistent with the solicitation, determine the impact of the reevaluations on the source selection decision, and document its reevaluation and new best value determination. . . .  Additionally, the Army has initiated an investigation in accordance with FAR 9.505 to determine the validity of the organizational conflict of interest (OCI) allegations in Oak Grove's protest.  The Army will also investigate the allegations set forth in Oak Grove's January 29, 2020 Notice of Possible Procurement Integrity Act Violations in accordance with FAR 3.104.  The Army will take appropriate action as necessary based on the results of the information gathered during the investigation.

AR 348 (emphasis added).  GAO dismissed OGT's protest, finding that the Army's planned corrective action rendered the protest academic.[7]  AR 350.

On February 18, 2020, the PCO authored a nine-page memorandum summarizing findings from his investigation of OGT's PIA and OCI allegations.  AR 2037–46.  As part of that investigation, government procurement officials and support contractors – [GH], [JL], [ZH], [MD] – provided written statements, in which they all categorically denied both having heard SSEB Chair [RM's] discussing influencing the procurement for the benefit of F3EA and having asked them to inflate F3EA's proposal ratings.  AR 2041–44.  The PCO further conducted in-person interviews with [JS] and [JL].  AR 2042–43.  SSEB Chair [RM] also submitted a written statement to the PCO, in which [RM] denied providing any advantage or assistance to F3EA.  AR 2044–45.

---

[6] It does not appear from the record that OGT knew of [RM's] role in this procurement at the time OGT made the allegations against him.  *See supra* n.3; *see also infra* Section V.C.

[7] Four other unsuccessful offerors separately filed protests with GAO, as well.  AR 4070.  Following the Army's notification of its intent to take corrective action, GAO similarly dismissed these protests as academic.  *Id.*

Moreover, [RM] asserted "that any task order that F3EA would have had a role in editing, would have been in the capacity of performance on the [SOF RAPTOR] III efforts[,]" as the incumbent on that contract.  *Id.*  Based on those written statements and interviews, the PCO concluded that OGT's allegations were not credible and, therefore, that no OCI or PIA violations could be substantiated.  AR 2045.  The PCO further memorialized these findings in yet another summary memorandum, dated May 1, 2020, in which the PCO critiqued the former F3EA employees' allegations because they "did not provide a timeline of when the statements and discussions occurred, the topics of the discussion and who were other parties that were present."  AR 2569–72.

Notably, however, the PCO did not interview the two former F3EA employees who made the allegations, nor did the PCO interview F3EA's [*  *  *] who, like [RM], was implicated in the allegations.  *See* AR 2037–46, 2569–72.  The record does not contain any indication that either the PCO or any government official interviewed [RM] regarding the allegations of improper conduct.  And, to be clear, neither memorandum notes or otherwise reveals the significant role that [RM] played in the procurement.

On August 31, 2020, following the Agency's investigation and other putative corrective action, the Army once again awarded the SOF RAPTOR IV contract to F3EA, having concluded that F3EA remained the offeror with the highest technical rating with the lowest price.  AR 3343–44.[8]  That same day, the Army informed OGT, via a debriefing letter, that "the [PIA] allegations were investigated and found to have no basis to support the allegations."  AR 3884–86.  On September 9, 2020, OGT filed a second protest with GAO, raising the same issues as the first protest.  AR 383–932.  On December 18, 2020, GAO denied the protest.  AR 4068–75.  GAO concluded that because the Agency reasonably assessed OGT's proposal as technically unacceptable (and thus unawardable), OGT lacked standing to challenge any remaining issues with the evaluation process.  AR 4071–72, 4074.

### E.    Procedural History

On January 21, 2021, OGT filed its complaint against the United States in this Court.  ECF No. 1 ("Compl.").  That same day, F3EA filed an unopposed motion to intervene, which this Court granted.  ECF No. 9, Minute Order (Jan. 21, 2021).  In the complaint, OGT alleges that the Agency:  (1) inadequately investigated whether [RM] steered the procurement award to F3EA (Count I); (2) awarded F3EA the contract

---

[8] After conducting the corrective action, the Army found that only two proposals were actually awardable, F3EA and Lukos, as the third offeror that was originally found to be awardable was later determined to be unacceptable for award.  AR 3350.

despite the existence of biased ground rule or unequal information OCIs (Count II); (3) violated FAR 1.602-2 and FAR 3.101-1 (Count III); (4) abused its discretion in failing to engage in discussions or clarifications with OGT (Count IV); (5) arbitrarily assessed weaknesses to various sections of OGT's proposal (Counts V–VIII); (6) misevaluated Lukos' proposal (Count IX); and (7) awarded F3EA the contract despite various critical deficiencies with its proposal (Counts X–XII).  Compl. at ¶¶ 8–27 (summarizing OGT's complaint counts).

On January 28, 2021, the Court held a status conference with the parties to discuss, among other things, whether OGT intended to seek preliminary injunctive relief.  ECF No. 18.  On February 1, 2021, the parties filed a joint status report, informing the Court that the Army had "certain exigent special forces training needs" for six task orders that would be awarded to F3EA under SOF RAPTOR IV between February 11, 2021 and May 3, 2021 and that OGT would not seek preliminary injunctive relief to enjoin their performance.  ECF No. 19 ("February JSR") at 1–2.  The parties further agreed that "no Party shall argue that the awarded task orders prevent the Court from providing complete declaratory and permanent injunctive relief" and that the Court "should make any relief ruling without regard to any cost or disruption from terminating, recompeting, or rewarding the challenged contract."  *Id.* at 2–3.

On February 10, 2021, the government filed the administrative record in this matter.  ECF No. 23.  On February 26, 2021, OGT filed its motion for judgment on the administrative record.  ECF No. 27 ("Pl. MJAR").  On March 26, 2021, the government filed its motion to dismiss for lack of standing pursuant to RCFC 12(b)(1) or, in the alternative, a cross-motion for judgment on the administrative record.  ECF No. 30 ("Def. MJAR").  That same day, F3EA also filed its cross-motion for judgment on the administrative record.  ECF No. 31 ("Intv. MJAR").  The parties filed timely response briefs.  ECF Nos. 35 ("Pl. Resp."), 38 ("Def. Reply"), 39 ("Intv. Reply").  On April 5, 2021, OGT filed a motion for leave to amend its complaint to add facts (supporting a challenge to Lukos' technical acceptability) that OGT asserted it learned only following the government's filing of the administrative record.  ECF No. 34.  While the government did not oppose the motion, F3EA did.  ECF No. 40.  OGT filed a reply brief in support of its motion for leave to file an amended complaint.  ECF No. 42.[9]  On May 12, 2021, the Court held oral argument.  ECF No. 41.

---

[9] Although the Court is not convinced that an amended complaint is required to support OGT's arguments regarding Lukos' proposal, the Court hereby **GRANTS** OGT's motion for leave to file an amended complaint, ECF No. 34, to the extent that OGT's argument would require additional supporting factual allegations.  Particularly in light of the fact that the government

Following oral argument, the Court directed the government, on May 20, 2021 (ECF No. 43), May 28, 2021 (ECF No. 53), and, again, on June 28, 2021 (ECF No. 63), to file certain documents that, erroneously, had been omitted from the administrative record as originally filed.  The government filed corrections to the administrative record on May 25, 2021 (ECF Nos. 47–49), June 1, 2021 (ECF Nos. 55–56), June 4, 2021 (ECF Nos. 59–60), and June 29, 2021 (ECF Nos. 64–66).

On May 25, 2021, OGT requested the Court order temporary injunctive relief regarding three task orders that the Army intended to award to F3EA between May 31, 2021 and June 15, 2021.  ECF No. 46.  On May 27, 2021, the government filed its response in opposition to the issuance of preliminary injunctive relief "due to the exigencies of the Government's issuing task orders for special forces training under the challenged contract[.]"  ECF No. 52.  The next day, the Court directed the parties to meet-and-confer to attempt to resolve the preliminary injunctive relief issue.  ECF No. 53.  On June 2, 2021, the parties filed a joint status report, informing the Court that OGT would withdraw its request and that "the Court should treat these three additional task orders (relative to relief) as the parties' [sic] agreed the Court should handle task orders 1–6[.]"  ECF No. 58 ("June JSR") at 1–2.  The parties further agreed "that should the Court issue permanent injunctive relief . . . none of the parties wish to see an abrupt cessation of services under the task orders that have been issued and are being performed . . . [and t]herefore, the parties will agree to cooperate to ensure a reasonable period of transition on any pending task orders that are being performed[.]"  *Id.* at 2.  The government represented to the Court that the Army "does not intend to issue any further task orders prior to July 31, 2021 (at the earliest)."  *Id.*

## II.    JURISDICTION AND STANDING

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).  To satisfy the "direct economic interest"

---

does not oppose OGT's motion and the fact that F3EA had an opportunity to address all of OGT's arguments, the Court concludes that the amended complaint does not prejudice F3EA in any way and, thus, there is no basis to deny OGT's motion.

requirement in a post-award bid protest, a plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

OGT was an actual offeror, as it submitted a timely proposal prior to the December 14, 2018 deadline for proposals.  AR 2576.  OGT alleges that but for the Agency's various errors in conducting the procurement at issue, OGT would have had a substantial chance of receiving an award and that, conversely, both F3EA, the actual awardee, and Lukos, another offeror, were ineligible for a contract award.  Pl. MJAR at 14–18.  Specifically, OGT argues, among other things, that the Agency credited F3EA's proposal with the capabilities and past performance of a significant team member notwithstanding that F3EA failed to include the required teaming agreement in its proposal and, with regard to Lukos, that the Agency evaluators found that Lukos' cost/price volume of its proposal contained a "significant performance risk" which the Agency appeared to have ignored.  *Id.* at 15–17.

The government argues, however, that should the Court conclude that the Agency reasonably found OGT's proposal unacceptable, OGT lacks standing to challenge any other alleged errors in the procurement.  Def. MJAR at 31.  Moreover, the government and F3EA contend OGT does not have a substantial chance of receiving this contract award because despite all of the allegations regarding the Agency's evaluation of OGT's and F3EA's proposals, Lukos was the next-in-line, awardable offeror.  Def. MJAR at 31–33; Intv. MJAR at 37–40.

As "standing is a threshold jurisdictional issue[,]" *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002), the Court must address the government's motion to dismiss for lack of standing before reaching the merits of this case.  *See Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits.").

Even when an agency has determined that an offeror is technically unacceptable, that alone does not vitiate an offeror's standing to challenge the results of a procurement pursuant to 28 U.S.C. § 1491(b).  Indeed, "[s]uch a position is contrary to established case law and has been rejected both in the Federal Circuit and this Court." *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 37–38 (2010) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed. Cir. 2006); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001); *Dyonyx, L.P. v.*

*United States*, 83 Fed. Cl. 460, 460 (2008)), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011). The correct rule is that "[a] bidder has an economic interest and therefore standing to challenge a contract award where, 'if the [offeror's] bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and [the bidder] could compete for the contract once again." *Eskridge & Assoc. v. United States*, 955 F.3d 1339, 1345-46 (Fed. Cir. 2020) (quoting *Impresa*, 238 F.3d at 1334); *see Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358–59 (Fed. Cir. 2015) (holding that unacceptable offeror has standing "if, as a result of a successful bid protest, the government would be obligated to rebid the contract and the protester could compete for the contract during the reopened bid"). Furthermore, in cases where there are more than two offerors, a protestor will have standing to allege "that it has a substantial chance of being awarded the contract if its allegations regarding the proposals of offerors who may be next in line for award are potentially meritorious." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 608 (2020).

Here, even putting aside OGT's allegations of error in the Agency's evaluation of its own proposal, OGT has alleged sufficient facts that, if true, demonstrate the Agency acted in an arbitrary and capricious manner, and otherwise abused its discretion, not only in evaluating F3EA's and Lukos' proposals but also in terms of the investigation that the Agency agreed to undertake as part of its corrective action following OGT's initial GAO protest. Such allegations, if proven, would arguably require the Agency to resolicit the SOF RAPTOR IV contract or engage in discussions because there would be no remaining awardable offeror. To the extent that the government disputes OGT's factual allegations regarding the flaws in Lukos' proposal, *see* Def. MJAR at 32–33, that is a merits question, not a standing issue. That is because "before reaching the merits of the parties' dispute, the court conducts only a 'limited review' of the plaintiff['s] allegations and the administrative record for the 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'" *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 530 n.12 (2010) (quoting *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005)). Again, "[a]t this point in the [standing] inquiry, we assume the well-pled allegations of error to be true." *Digitalis Educ. Sols., Inc. v. United States,* 97 Fed. Cl. 89, 94 (2011), *aff'd,* 664 F.3d 1380 (Fed. Cir. 2012). The Court concludes that OGT has pled sufficient facts supporting allegations of procurement errors to establish standing and, therefore, to have its claims decided on the merits.

## III.   STANDARD OF REVIEW

Judgment on the administrative record pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the record evidence. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). Pursuant to that APA standard, the Court asks, "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)). In other words, the Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).

"When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citation marks omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333 (internal quotation marks omitted). To establish prejudice in a post-award challenge, a protester must further demonstrate that "'but for the alleged error, there was a substantial chance that it would receive an award–that it was within the zone of active consideration.'" *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (brackets omitted) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).

## IV.   THE GOVERNMENT VIOLATED THIS COURT'S RULES GOVERNING THE FILING OF THE ADMINISTRATIVE RECORD

Before proceeding to the merits of this case, the Court is compelled to address the government's mishandling of the administrative record in this case. In a procurement-related action pursuant to 28 U.S.C. § 1491(b), this Court is required to base its APA

review of agency action on "'the full administrative record that was before the [agency decision maker] at the time he made his decision.'"  *East West, Inc. v. United States*, 100 Fed. Cl. 53, 56 (2011) (alteration in *East West*) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)); *see Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 92 (2011) ("[T]o perform an effective review . . . , the court must have a record containing the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process."); *cf. Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1276 (D. Co. 2010) ("[t]he proper touchstone remains the decision makers' actual consideration").  "Implementing that idea, this Court's Rules [in RCFC Appendix C, ¶¶ 21–24] provide detailed guidance on what documents typically should be included in the administrative record."  *Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 178 (2021).

However, "[t]he court's review function is undermined when an agency assembles a record that consists solely of materials that insulate portions of its decision from scrutiny or that it deems relevant to specific allegations raised by a protester."  *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 168–69 (2011).  Moreover, "[a]llowing a protest to be decided upon an AR which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review."  *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366 (2009).  Simply put, "an agency does not possess the discretion to make these records whatever it says they are."  *East West*, 100 Fed. Cl. at 56.

In the instant case, the government's handling of the administrative record is unacceptable.  Two of the central issues in this bid protest are:  (1) whether SSEB Chair [RM] acted improperly during the course of this procurement, to the detriment of the integrity of the process, generally, and to OGT, in particular; and (2) whether Lukos was eligible for a contract award, a fact which the government argued – both before GAO and, again, before this Court – should deprive OGT of standing.  Compl. at ¶ 23; Def. MJAR at 31–33.  As detailed *infra*, notwithstanding the centrality of those two questions to this case, the government omitted several critical documents from its initial and subsequent administrative record filings, which documents directly and unequivocally undermine the government's position.

For the sake of completeness of this decision, the Court reviews the record issues, both procedurally and substantively, in detail.

On May 20, 2021, following oral argument, the Court ordered the government to complete the administrative record with specified documents and to provide an explanation for why those documents were not included in the Agency's initial

administrative record filing.  ECF No. 43.  The Court identified those omitted documents because the initial administrative record referenced but did not include them.  In response, the government filed a corrected administrative record, for the first time including several key documents, including a DCMA financial capability report regarding Lukos' cost/price volume, the administrative volume of Lukos' proposal, and various proposal evaluation reports and source selection documents from the Agency's pre-corrective action evaluations and decision-making.  ECF No. 47.

The government repeatedly explained, in its response to the Court's May 20, 2021 order, that the government believed that a number of these documents were "*not considered especially relevant* or necessary to the instant protest."  *Id.* at 2 (emphasis added); *see id.* at 3, 4, 6.  The government doubled down on the legal grounds for its proffered rationale, explaining:

> As an initial matter, it is our understanding that not all documents are required to be included in the administrative record and certain documents regarding a superseded evaluation were not considered relevant. See Rules for the Court of Federal Claims (RCFC) Appendix C.  In addition, Appendix C ¶ 22 lists items that "may . . ., as appropriate" be among the "core documents relevant to a protest."  It is, therefore, not binding, nor is it exhaustive.  *See Allied Tech. Grp., Inc. v. United States*, 92 Fed. Cl. 226, 230–31 (2010) ("Appendix C, ¶ 22(u) employs the words 'may' and 'as appropriate,' leaving it to the Court's reasoned discretion to determine when materials should be added to the administrative record.").  With these considerations in mind, we exercised discretion in assembling the AR. To the extent that we omitted certain documents that should have been included, which [sic] apologize.

ECF No. 47 at 1-2.

The government's failures did not end there.  On May 28, 2021, following a status conference, during which OGT's counsel noted that other important administrative record documents – F3EA's Appendix B to its capability volume and the entire cost/price volume of its proposal – inexplicably appeared to be missing from the administrative record, the Court directed the government, yet again, to ensure that the filed administrative record was complete.  ECF No. 53.  Specifically, the Court ordered that "counsel of record for the government shall consult with the cognizant contracting

officer to determine whether any other documents relating to the agency's decision-making at issue (*e.g.*, [F3EA]'s proposal, [Lukos'] proposal, and/or [RM's] role in the procurement at any stage) were omitted from the administrative record." *Id.* at 2.

In response, the government filed yet *another* corrected version of the administrative record, this time producing the remainder of F3EA's proposal and, *without any explanation for its original omission*, a letter terminating [RM's] role as SSEB Chair.  ECF No. 56.  That letter, dated April 30, 2020,[10] memorialized as follows:

> This termination is the result of repeated inconsistencies within multiple revisions of the Proposal Evaluation Report (PER), including significant findings being omitted that were documented in the consensus roll up. These omissions resulted in incomplete evaluation review by the Source Selection Advisory Council and (SSAC) and SSA and incomplete evaluation information being provided to the Offerors during the debriefing. As a result of multiple Government Accountability Office protests, the Procuring Contracting Officer initiated corrective actions to review and amend the PER to ensure that the solicitation criteria was followed. The corrective action was to add the omitted information into the PER, review the findings for compliance and determine if the ratings assessed were still relevant considering the additional information. Each subsequent version of the PER has had significant areas of disagreement between the documented findings and the solicitation requirements or areas where the proposal citations do not support the rating that was assessed. The fact that these areas seem to persist with every new version of the PER has led to the conclusion that appointment of a new SSEB Chairperson is necessary.

AR 5388.

On June 4, 2021, the government produced yet additional administrative records documents that were missing from OGT's cost/price and administrative volumes, relevant evaluation reports, and pre- and post-corrective action communications

---

[10] The Agency issued this letter, terminating [RM] from his role as SSEB Chair, during corrective action, before the Agency's second award decision.  *See* AR 5388.

between OGT and the Agency.  ECF Nos. 59–60.  Finally, on June 28, 2021, the Court discovered that a certain source selection document that the government purported to have filed was still not in the corrected administrative record; the Court ordered the government to file this document, ECF No. 63, which the government promptly filed the next day.  ECF Nos. 64–66.

The government's conduct regarding the administrative record is simply unacceptable and there are a several glaring flaws with its proffered explanations for its conduct.

*First*, although the government repeatedly attempted to excuse its failure to include in the administrative record particular documents, utilizing a "not especially relevant" standard, counsel for the government was unable to provide any authority to support that standard.  Indeed, he immediately abandoned the contention when questioned during a status conference.  ECF No. 62 ("May 28, 2021 Status Conference Tr.") at 38:18–39:3 ("I'm not suggesting there's an especially relevant standard, but -- and if I've expressed that awkwardly, I apologize.").  The government, however, provided no other explanation for the critical document omissions.

*Second*, in compiling the administrative record, the government does not possess a unilateral veto over administrative record documents based on a self-serving conclusion that they are not relevant to the procurement decision under review.  Again, the "whole record" consists of "all the material that was developed and considered by the agency in making its decision."  *Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 552–53 (2009) (internal quotation marks omitted).  Although the government relied upon Appendix C, ¶ 22, of this Court's Rules to justify withholding particular documents from the administrative record, *see* ECF No. 47, that paragraph of this Court's Rules provides no such support.  Paragraph 22 of Appendix C simply does not address the scope and contours of an administrative record generally, but rather only identifies a non-exhaustive list "of relevant *core* documents" in order to "expedite final resolution of the case."  RCFC App. C, ¶ 22 (emphasis added).   The next paragraph, ¶ 23 of Appendix C, makes perfectly clear that the "core documents" are only intended to capture a subset of the complete administrative record; indeed, that latter paragraph provides that "the court expects the United States to produce the core documents ***and the remainder of the administrative record*** as promptly as circumstances will permit." *Id.* ¶ 23 (emphasis added); *see also id.* ¶ 24 ("Any additional documents within the administrative record must be produced at such time as . . . ordered by the court.").

*Third*, while the government attempts to excuse its failure to include certain documents in the administrative record on the grounds that they were not germane to

the Agency's latest contract award decision (*i.e.*, following corrective action), *see* ECF No. 47, that explanation falls particularly flat. For starters, the Agency included in the originally-filed administrative record documents related to the first contract award decision that formed the predicate for the GAO protest and the Agency's subsequent corrective action,[11] thus demonstrating that not even the government believes its own test for what should be included (or excluded) from the record.

Moreover, with respect to the DCMA report, in particular, the government's explanation is clearly erroneous, if not frivolous. That document is decisively probative regarding Lukos' eligibility for a contract award. *See infra* Section V.A.2. Given the government's reliance throughout this dispute – both before GAO and this Court – on Lukos' status as a potential awardee, why any information related to that offeror was omitted from the administrative record is inexplicable. Indeed, counsel for the government readily conceded the distinction between documents related to Lukos and those related to other offerors not at issue here.[12] The same is true for the inexplicable omission from the initial record of the letter terminating [RM] from his position as SSEB Chair – particularly given his central role in OGT's allegations of improper conduct. *See infra* Section V.C.

*Fourth*, although counsel for the government later contended that the Agency's document omissions were merely "an oversight," *see* May 28, 2021 Status Conference Tr. at 56:15–17, that facile explanation does little to mitigate the harm that the government has caused in this case by excluding specific documents that should have been included as part of the record from the outset. As this is a record review case, discovery typically is not available; indeed, the government understandably and routinely opposes discovery in bid protest cases, not to mention requests to supplement the record. *Naval Sys.*, 153 Fed. Cl. at 178. But there is a necessary corollary to those rules: plaintiffs must be entitled to rely upon the government's certification that the filed administrative record is complete. *See* ECF No. 23-1 at 1. Plaintiffs should not have to police the government's filing as if routine discovery rules apply. Indeed, it is not as if in these cases a plaintiff can even engage in discovery to learn what documents exist because, to a great extent, a plaintiff in a § 1491(b) action is at the mercy of the government to file a complete, certified record. That the government later readily offers

---

[11] *See, e.g.*, AR 3372–3425.

[12] May 28, 2021 Status Conference Tr. at 44:10–19 ("THE COURT: Well, let me ask you this, Mr. Pixley. Are there any other documents that were not considered especially relevant that were excluded? MR. PIXLEY: I think there are a whole bunch. For example, there were seven other offerors, Offeror A, Offeror J, okay, we didn't include the other IDIQ participants. THE COURT: But Offeror H has been at issue here the whole time. MR. PIXLEY: Yes, yes.").

to complete the record when challenged by a plaintiff (or the Court) does not cure the harm caused by an incomplete record.  *See* May 28, 2021 Status Conference Tr. at 61:10–14.  The government's waiting for a plaintiff (or the Court) to complain about the contents of an administrative record is not an approach that this Court will condone.[13]

As much as the Court would like to assume good faith, the government admits that it made sentient choices regarding the contents of the administrative record, all of which appear to have favored the Agency.  Such apparent gamesmanship wastes judicial resources and undermines trust in both the procurement and disputes processes.[14]  Accordingly, the government is ordered to show cause why Defendant should not be sanctioned for wasting the Court's (and Plaintiff's) time and resources on these administrative record deficiencies.

## V.   DISCUSSION

OGT contends that the Agency erred in assessing OGT's proposal with numerous deficiencies, arbitrarily determined that F3EA and Lukos submitted awardable proposals, abused its discretion in failing to engage in discussions, and conducted an inadequate investigation of improper conduct by [RM].  Compl. at ¶¶ 8–27; Pl. MJAR at 2–6.  Although OGT's complaint raises twelve claims, OGT correctly notes that "the Court need not find that any aspect of the Agency's technical evaluation of [OGT's] proposal was improper to grant judgment in [OGT's] favor."  OGT Resp. at 26.  Nor does the Court need to resolve every issue that OGT raises regarding F3EA's and Lukos' proposals.  This is because the Court concludes that OGT has sufficiently

---

[13] While there is a distinction between the GAO's record production requirements and the Court's Rules governing the filing of the administrative record, the Court is concerned that the Agency, having failed to disclose relevant facts and documents during the GAO protest, attempted to protect itself by continuing its obfuscation during this case.  *See* K. Sacilotto & J. Frazee, *Is a Record by Any Other Name Still a Record?*, at *1 (American Bar Association 2021 Public Contract Law Virtual Federal Procurement Institute Mar. 12, 2021), *available at* https://www.americanbar.org/events-cle/ecd/ondemand/409718248/ (explaining that in contrast to GAO protest proceedings, "the COFC rules expressly requires production of the administrative record, without the need for the protester to explain the relevancy of those documents to the protest arguments raised" and that "the 'relevant' documents produced [at the GAO] can be a fraction of the *actual* record of the procurement before the agency evaluators and source selection authority" (emphasis in original)).

[14] Sacilotto & Frazee, *supra* n.13, at *2 ("As a result of these differences in record contents, some protests that GAO has denied are later sustained at the Court, and the difference in decision . . . can be tied to the more fulsome record produced at the Court versus the GAO.").

demonstrated that the Agency acted in an arbitrary and capricious manner in several respects, thus providing a basis for ruling for OGT on the merits.

Pursuant to the APA arbitrary and capricious standard of review, "[w]here, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion[.]" *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (internal quotation marks omitted); *see Atar S.R.L. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013) ("Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." (internal quotation marks and alteration omitted)). "This standard requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002). Although agencies "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process[,]" *Impresa*, 238 F.3d at 1332–33 (internal quotation marks omitted), a court should not "defer to the agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dept. of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004). In that regard, this Court will sustain a bid protest where the protester demonstrates that the agency's decision "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in *Ala. Aircraft* omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## A.   The Agency Acted Arbitrarily In Finding That F3EA And Lukos Submitted Compliant, Awardable Proposals

### 1.   The Agency Failed To Consider F3EA's Noncompliance With The RFP's "Teaming Arrangement" Provision

OGT asserts that F3EA's proposal was deficient because it did not submit its teaming agreement with [*   *   *], Compl. at ¶¶ 283–88, and because "[t]he Agency failed to enforce its mandatory teaming requirement when it evaluated F3EA's proposal." Pl. MJAR at 42–43. The Court agrees.

FAR 9.601 defines a "contractor team arrangement" as either:

(1) Two or more companies form a partnership or joint venture to act as a potential prime contractor; or

(2) A potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program.

The second type of agreement, commonly referred to as a prime/subcontractor "teaming agreement," has been described "as a fundamental business strategy" in which "Government contractors . . . combin[e] their performance capabilities with those of other contractors, thereby enhancing the prospects for being awarded Government contracts." Robert H. Koehler, *Teaming Agreements: The Proverbial "Wolf in Sheep's Clothing*," 14-6 Briefing Papers 1, 1 (May 2014). Indeed, "[a] benefit can be that the past performance and experience of an intended subcontractor can bolster a prime contractor's competitive position and address gaps in the prime contractor's performance capabilities." Michael W. Mutek, *Close Enough for Government Work: The Economic Utility of Teaming Agreements and the Issue of Enforceability*, 49 Pub. Cont. L.J. 423, 426 (2020) (citation omitted).

Here, the RFP required that "[p]roposals shall be compliant with the full solicitation" and that "offerors are required to comply with all requirements stated herein." AR 1693 (§ L.1.7). With respect to the administrative volume, the RFP instructed that "[o]fferors shall include in full all executed teaming arrangements . . . as applicable." AR 1706 (§ L.7.7). The Federal Circuit has emphasized that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *Allied Tech. Grp.*, 649 F.3d at 1329 (internal quotation marks omitted). "So long as the requirement serves a substantive purpose, it is material." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 507 (2019). While the RFP further provided that an incomplete proposal "may" be disqualified "at the sole discretion of the PCO[,]" AR 1695 (§ L.3.1), such discretion must be read in light of the mandate in Section L.1.7 and must be exercised reasonably.

Contrary to the government's and F3EA's view, the requirement for an offeror to provide an executed teaming arrangement is not merely an inconsequential formality, but rather serves a substantive and material purpose – ensuring that prime contractors cannot simply claim the capability and experience of another contractor for the purpose

of making the offeror's proposal more competitive, absent some concrete evidence that the described team will actually perform an awarded contract.  While the RFP noted "that companies are not locked into any teaming arrangement or subcontractors for future work under SOF RAPTOR IV[,]" AR 1706 (§ L.7.7.1), that caveat is a truism insofar as the government cannot compel a proposed team member or subcontractor, with which the government is not in privity, to perform a subcontract.  But that fact does not undermine the substantive purpose of the requirement to provide teaming agreements in order for an offeror to claim and obtain credit for another company's capabilities or experience.  That the Solicitation confirmed an awardee will have the flexibility to change its manner of performance over time does not substantiate F3EA's argument "that the Agency did not consider teaming arrangements with subcontractors to be of substantial import." Intv. MJAR at 66.  The Court finds F3EA's argument unpersuasive.

F3EA further contends that the RFP's instruction for an offeror to submit an executed teaming agreement was not a material requirement, *per se*, because that instruction governs only the contents of the administrative volume which is not evaluated; that is, the requirement is only mentioned in the Section L proposal instructions, but not in the Section M evaluation criteria.  Intv. MJAR at 67–68.  Alternatively, F3EA argues that "OGT's argument must also fail because nothing in the Capability factor proposal instructions or evaluation criteria required a teaming agreement to be submitted in order to receive credit for contributions of a proposed subcontractor." *Id.* at 68.  These attempts to undermine the importance of the RFP's requirement for an offeror to provide such agreements as part of its proposal are unavailing.

*First*, the Court finds that a requirement to provide teaming agreements as part of a proposal serves to substantiate that the offeror has a bona fide arrangement with another contractor to bring together their capabilities and experience, and, concomitantly, precludes an offeror from claiming the experience of another company with which it has no relationship or no intent to cooperate to perform a particular contract.  A teaming agreement thus plays a similar role to commitment letters for proposed key personnel (often required in other procurements), regarding which GAO has held that "[g]enerally, a requirement for letters of commitment from key personnel constitutes a material solicitation requirement." *IT Objects, LLC*, B-418012, 2020 CPD ¶ 2, 2020 WL 104156, *5 (Jan. 2, 2020); *see Wyle Lab'y, Inc.*, B-412964.3, 2016 CPD ¶ 144, 2016 WL 3124842, *7 (May 27, 2016) (same).  Even when an RFP's evaluation criteria in Section M does not explicitly address teaming agreements, an RFP's instruction to provide such agreements serves an important gatekeeping function to prevent an

offeror from obtaining unjustifiable credit. *See Sentrillion Corp. v. United States*, 114 Fed. Cl. 557, 568 (2014) (holding that the RFP's requirement for binding teaming agreements "clearly had a rational relationship to the agency's needs" because "[a]n agency rationally may ask to know who will be providing services under a contract"). This, of course, is why the RFP includes such an instruction in the first place. The alternative is to read the RFP instruction entirely out of the solicitation as serving no purpose whatsoever. There is no rule that a Section L instruction cannot serve a substantive purpose; on the contrary, this Court has upheld an agency's decision to reject an offeror's proposal solely for the failure to redact sections of its proposal pursuant to the instructions in the RFP. *See Strategic Bus. Sols., Inc. v. United States*, 129 Fed. Cl. 621, 628–30 (2016), *aff'd*, 711 F. App'x 651 (Fed. Cir. 2018). In *Strategic Business Solutions*, this Court held that "the redaction requirement . . . is not a formalistic one . . . [i]t served a substantive purpose–promoting the unbiased evaluation of all offerors' proposals." *Id.* at 629. The Court here finds the same to be true of the RFP's teaming agreement requirement.[15]

    *Second*, after the RFP required offerors to submit "all executed teaming arrangements," the RFP added that "any previous teaming arrangements . . . *that [are] referenced within the proposal shall be included as attachments in the admin volume as supporting documentation*." AR 1706 (§ L.7.7) (emphasis added). The RFP thus makes abundantly clear that there is a direct connection between other sections of an offeror's proposal – *i.e.*, the capability and past performance volumes – and the need for the Agency to review the teaming arrangements to substantiate the claimed references in those other volumes.[16]

    The Court acknowledges that this is not a case where the RFP mandated the automatic exclusion of an offeror's proposal for failure to adhere to this instruction; rather, the RFP cautioned offerors that "[f]ailure of an offeror to provide all requested

---

[15] To the extent GAO has held that a Section L proposal instruction cannot be material unless there is precise, corresponding Section M evaluation criteria, *see* Intv. MJAR at 67-68, this Court disagrees.

[16] Although the words "supporting documentation" are located in the sentence addressing "previous teaming arrangements," the Court, as it must, reads the Solicitation as a whole, and finds that this rationale obviously applies to the requirement for submitting "executed teaming arrangements" in support of an offeror's proposal for completing future work on the SOF RAPTOR IV. In light of the Court's conclusion that the requirement to substantiate teaming arrangements is a material term of the solicitation, the Court need not reach the issue of whether a Section L instruction regarding an unevaluated volume of a proposal may serve as a basis for disqualifying a proposal. *See* Intv. MJAR at 67-68 (arguing that lack of Section M evaluation criteria obviated the need for F3EA to comply with Section L.7.7).

proposal information may render the offeror's proposal as non-compliant and, as such, the offeror's proposal will not be evaluated, at the sole discretion of the PCO."  AR 1695 (§ L.3.1).  Notwithstanding that the RFP vested the consequences of non-compliance in the discretion of the PCO, that does not end this Court's inquiry.  Consistent with the APA standard of review, the administrative record must support that the Agency identified this flaw in the proposal, exercised its discretion to not find the proposal non-compliant (or to waive the flaw), and "present[ed] a full and reasoned explanation of its decision."  *In re Sang Su Lee*, 277 F.3d at 1342.  An agency's failure to consider the issue or to exercise discretion absent any supporting rationale is, by definition, an abuse of discretion.

F3EA did not submit an executed teaming arrangement with [*  *  *] in its administrative volume, *see* AR 3598–3608, but [*  *  *] is referenced throughout F3EA's proposal as a proposed team member.[17]  In F3EA's capability volume, for example, F3EA extensively highlighted the advantages to its proposal that [*  *  *] would provide, as follows:

[*  *  *]

[*  *  *]

[*  *  *]

AR 3069.

---

[17] The government bizarrely argues that the RFP's requirement that offerors provide teaming agreements "as applicable" means only that the offeror must provide the teaming arrangement if the parties "actually had a written teaming agreement . . . which is not a given between contractors."  Def. MJAR at 55 (internal quotation marks omitted).  This argument borders on the absurd because "as applicable" most certainly refers to a situation where the offeror claims the experience and capabilities of a planned team member or subcontractor, as in the instant case.  According to the government's argument, the Agency believed it might be important to review the terms of a teaming agreement if it existed but otherwise did not care if the claimed relationship was purely fictional.  The argument virtually refutes itself.

This series of paragraphs appears again in F3EA's administrative volume. AR 3602. But, more critically, F3EA *fully relied* on [* * *] as its technical solution in response to [* * *] in the capability volume's core competencies subsection. AR 3137–42 ("F3EA proposes [* * *], *which will be provided by our teammate,* [* * *]." (emphasis added)). Throughout F3EA's narrative, it identified that [* * *] possessed this technology, not F3EA.[18] The Agency assigned three strengths for F3EA's technical approach for the NGSTS requirement, concluding that it "[e]xceeds specified performance requirements." AR 3400. This in no small part contributed to F3EA's rating of "outstanding" for its core competencies evaluation subfactor. *See* AR 3353 ("[* * *]").

Furthermore, F3EA claimed past performance credit for [* * *] contracts for which [* * *] served as the prime contractor. AR 3249–50. The Agency did not evaluate [* * *] of those submissions because it was a classified contract but the Agency *did* rate the other [* * *] submissions – finding one "very relevant" and the other "relevant" to SOF, generally, but not relevant to the STOs, in particular. AR 3358. The Agency rated F3EA with a "very relevant/substantial confidence" past performance rating because "[t]he Prime Contractor, *as well as the Offeror's one major [proposed] subcontractor*, has a strong organic capability to successfully perform [* * *] with a high degree of confidence. The contributions of the [* * *] subcontractor bring a legitimate [* * *] capability to the team with an existing, proven solution very similar to the [* * *] requirements in [* * *]." AR 3358.

In sum, F3EA's proposed collaboration with [* * *] contributed to the Agency's favorable rating of F3EA's proposal under an RFP where capability and past performance were the most important factors and a sub-acceptable rating on any element of the capability volume would have led to the proposal being rejected. AR 1709. Nowhere in the administrative record does it appear that the Agency identified the issue of F3EA's failure to comply with the RFP's teaming arrangement instruction; nor did the Agency provide a reason for letting F3EA claim credit for [* * *]'s capabilities and experience without requiring supporting documentation consistent with that instruction. Having determined that the Agency failed to exercise its discretion to waive non-compliance with the teaming arrangement provision, the Court cannot conclude that the Agency acted reasonably under the facts of this case.[19]

---

[18] For example, "[* * *], [* * *], and [* * *]." AR 3140, 3141.

[19] The government argues, in the alternative, that F3EA complied with the teaming agreement instruction by including "documentation of its contractual relationship with [* * *], in F3EA's Volume II past performance submission." Def. MJAR at 55. The Court rejects the government's

The prejudice is clear.  F3EA's proposal failed to comply with a material Section L instruction that had profound implications for its evaluation under Section M. Whether that means that F3EA's proposal should have been disqualified *per se* for submitting a noncompliant proposal, or whether that means its evaluation was fatally flawed because F3EA could not obtain any type of credit for its proposed team member and putative subcontractor – either way – the Court cannot conclude that F3EA's proposal was awardable.  To the extent the Agency reached a different conclusion, its decision is not justified on this record because the Agency never considered F3EA's compliance failures.

### 2.  The Agency Failed To Comply With The RFP's Requirement To Evaluate The Financial Responsibility Of Lukos' Proposal

In OGT's original complaint**,** OGT asserted that Lukos is not an awardable offeror – and thus cannot serve to deprive OGT of standing – because "the Agency failed to perform a meaningful price reasonableness evaluation."  Compl. at ¶¶ 486–91. Following the government's filing of the administrative record, in which additional facts concerning Lukos' proposal came to light, OGT amended its complaint to include, among other things, allegations that the Agency, in finding Lukos potentially awardable, failed to account for "numerous inconsistencies" in Lukos' cost/price volume.  ECF No. 34-1 at ¶¶ 487–507; Pl. MJAR at 16–18.  This Court finds that the administrative record conclusively demonstrates that Lukos, in fact, was ineligible for a contract award.

The RFP required offerors to submit a cost/price volume that would be evaluated, respectively, for reasonableness and realism.  AR 1713–14 (§ M.4.3).  The RFP provided that "[a]s part of this evaluation, the Government may consider DCMA and DCAA audit information and other information the Government deems relevant."  AR 1714 (§ M.4.3.4).  Before concluding that an offeror was financial responsible, however, the RFP explained that the Agency would request "DCAA . . . to perform a Financial Capability Risk Assessment for the Prime offeror . . . [and t]he Prime offeror *must be deemed financially responsible* by the Contracting Officer based on the Financial Capability Risk Assessment."  AR 1714 (§ M.4.3.7) (emphasis added).

---

argument that merely submitting past performance contracts is the same as providing an executed teaming agreement.  And, in any event, the Court reviewed the [* * *] past performance contract references that F3EA submitted to the Agency but could not find how those contracts demonstrate any relationship between F3EA and [* * *].  *See* AR 3249–50.

In the Source Selection Decision Document (August 28, 2020), the SSA noted, as follows:

> Price Analysis - It should be noted that [Lukos] [*   *   *].

AR 3368.  Furthermore, the Consolidated Prenegotiation Objective Memorandum ("POM")/Price Negotiation Memorandum ("PNM") noted that while DCAA issued a Preaward Accounting System report for all offerors and determined that "[a]ll accounting systems were found to be acceptable for award[,]" a separate financial capability assessment was conducted, which determined that:

> a. Offerors [*   *   *] were found to be financially capable of performing the contract, with moderate risk on a scale of Low-Moderate-High.

> b. *Offerors [*   *   *], and [Lukos], were found to be* **NOT financially capable** *of performing the contract, with high risk on a scale of Low-Moderate-High.*

AR 3423 (emphasis added).

The government originally contended that "[t]he evaluators did not ignore anything."  Def. MJAR at 33 (internal quotation marks omitted).  Rather, "[t]he evaluators considered both the technical team's evaluation of the capabilities factor and subfactors . . . as well as the cost evaluation . . . taking note of the cost evaluators' assessment of performance risk – – and stated their findings in the report."  *Id.*; *see also* Def. Reply at 15–16.  Even with just these initial findings, the Court struggles to understand how the Agency evaluators properly considered these adverse financial evaluations and still deemed Lukos awardable.

But, as the saying goes: wait, there's more. Although not included in the government's original administrative record filing, the Court, in its May 20, 2021 order, *see* ECF No. 43, directed the government to file the underlying audit reports referenced in the POM/PNM.  The government complied with this order.  ECF No. 47.  In reviewing these documents, the Court was surprised to discover that DCMA in fact had explicitly recommended "***No Award***" for Lukos.  AR 4994 (emphasis added).  DCMA explained its recommendation:

> As a result of our analysis, *we do not find [Lukos] to be financially capable* of supporting . . . [the Solicitation]. . . . [*   *   *] *Our recommendation for NO AWARD was made after analysis of all*

> *information available to us for this formal Pre-award Financial*
> *Capability Survey.*

AR 4996 (emphasis added).  This document clearly demonstrates that Lukos was found to be not financial capable and thus was not awardable consistent with the RFP's requirements.  *See* AR 1714 (§ M.4.3.7).  Nowhere does the record demonstrate that the Agency even considered this DCMA finding (assuming for the sake of argument that the contracting officer were permitted to depart from it).  In sum, the government's contention that Lukos is an offeror capable of being awarded the contract – thus depriving OGT of standing – violates the RFP or, at a minimum, "runs counter to the evidence before the agency" and constitutes the very height of arbitrary and capricious decision-making.  *Ala. Aircraft Indus.*, 586 F.3d at 1375.

Following the exceedingly late disclosure of this document, the government changed its tune, arguing that the "no award" finding does not really mean "no award."  ECF No. 47.  Specifically, in the government's response to the Court's May 20, 2020 order, the government provided an extensive *post hoc* rationalization from the cognizant PCO:

> Since this was an unpopulated Joint Venture, Lukos VATC provided a guarantor who would support the offeror financially if necessary. That guarantor was found to not have sufficient resources to finance a contract of this size, which is not surprising.

> If Lukos VATC would have been the awardee for this procurement, the Government would have several paths to award to Lukos VATC in the face of the no-award determination identified in the report.

*Id.* at 4–5 (discussing at length how the Agency might have been able to award a contract to Lukos despite the DCMA's finding).

Again, even assuming the RFP's terms provided the contracting officer with some discretion to depart from the Financial Capability Risk Assessment when grounded in reasonable decision making, the Court declines to credit the PCO's naked assertions made in the heat of litigation particularly because "'[a]ny *post hoc* rationales an agency provides for its decision are not to be considered.'"  *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 376 (2010) (quoting *Gen. Elec. Co. v. Dept. of Air Force*, 648 F. Supp. 2d 95, 100 (D.D.C. 2009)).  Rather, "'[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its actions are

based.'" *Applied Bus. Mgmt. Sols., Inc. LLC v. United States*, 117 Fed. Cl. 589, 604 (2014) (quoting *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012)). "*Post hoc* rationales should not form the basis of agency decision-making." *Savantage Financial Servs., Inc. v. United States*, 150 Fed. Cl. 307, 327 (2020). Contrary to the government's characterization, this statement from the cognizant PCO was *not* an explanation regarding "why this document was not earlier provided[,]" ECF No. 47 at 4–6 – which is what the Court ordered the government to address – but rather was nothing more than a *post hoc* argument regarding why the Court should disregard the DCMA's finding.

This Court will not permit the government to withhold highly relevant documents and then – when those documents ultimately come to light and the Agency is confronted with them – allow the Agency to submit unsupported assertions in what is essentially an unsworn declaration from the PCO included in the government's brief in order to cure a defect not only in the government's procurement but in its handling of the administrative record.[20]  The Court rejects as preposterous the government's entire approach – both substantive and procedural – to this issue.

Given that both F3EA's and Lukos' respective proposals – and their evaluations – suffer from serious compliance defects under the RFP's terms, OGT has succeeded on the merits of its complaint.

### B.    The Government Should Have Conducted Discussions

OGT asserts that the Agency's decision not to engage in discussions violated DFARS 215.306 or was otherwise arbitrary and capricious.  Compl. at 68–70.  The Court agrees.

FAR 15.306(d) delineates the rules for "[e]xchanges with offerors after establishment of the competitive range." In that regard, "[t]he hallmark of such exchanges, called 'discussions,' is that they 'are undertaken with the intent of allowing the offeror to revise its proposal.'" *CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 744 (2014) (quoting FAR 15.306(d)); *see also Info. Tech.*, 316 F.3d at 1322 (noting that FAR 15.306 "contemplates discussions as occurring in the context of negotiations" during which "bidders have the opportunity to revise their proposals" (citing FAR 15.306(d))).

---

[20] To be clear, the government did not move to supplement the administrative record with any declaration or affidavit from the PCO.

The Federal Circuit has explained that "[u]nder [FAR] section 15.306(d)(3), whether discussions should be conducted lies within the discretion of the contracting officer." *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) (citing FAR 15.306(d)(3)). In this case, the Solicitation included a provision noting that the Agency reserved the discretion to award a contract without engaging in discussions. AR 1708. While "[t]he general rule is that once offerors are warned that the agency intends to award without discussions, absent special circumstances, the contracting officer has the discretion to award without discussions[,]" *Chenega Healthcare Servs., LLC v. United States*, 138 Fed. Cl. 644, 653 (2018), that does not mean that such discretion is plenary. *Day & Zimmermann Servs., a Div. of Day & Zimmermann, Inc. v. United States*, 38 Fed. Cl. 591, 604 (1997)).[21] Indeed, wherever a regulation provides the government with discretion to take (or not to take) an action, such discretion must be exercised reasonably and not in arbitrary and capricious manner. *Essex Electro Eng'rs, Inc. v. United States*, 458 F. App'x 903 (Fed. Cir. 2011) (per curiam) ("When a solicitation states that formal discussions are not required, there may be some circumstances in which the government's failure to hold discussions would be arbitrary and capricious.").

In this case, the picture is further complicated by DFARS 215.306, which provides that "[f]or acquisitions with an estimated value of $100 million or more, contracting officers *should* conduct discussions." DFARS 215.306(c)(1) (emphasis added). Without resorting to case law, the DFARS provision's plain language suggests that an agency must justify *not* engaging in discussions where the provision applies. FAR 2.101 (defining "should" as "an expected course of action or policy that is to be followed unless inappropriate for a particular circumstance"). Put differently, the DFARS provision's plain language would seem to create a presumption in favor of an agency's conducting discussions. The Federal Circuit's decision in *Dell Federal Systems, L.P. v. United States* removes any doubt that DFARS 215.306 generally requires an Agency to engage in discussions. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018).

---

[21] In contrast, GAO appears to treat the government's discretion as unreviewable. In *Booz Allen Hamilton, Inc.*, the protester argued that the Navy abused its discretion by failing to hold discussions with the offerors. *Booz Allen Hamilton, Inc.*, B-405993, 2012 CPD ¶ 30, 2012 WL 310875 (Jan. 19, 2012). The solicitation at issue, however, expressly advised that the agency contemplated making award without discussions. *Id.* at *2. GAO concluded that in such circumstances "[a]n agency's decision not to initiate discussions is a matter we generally will not review." *Id.* at *11 (citing cases and concluding that "[t]o the extent our decision in *The Jonathan Corp.*; *Metro Mach. Corp.*, B–251698.3, B–251698.4, May 17, 1993, 93–2 CPD ¶ 174 at 15, establishes a different rule, it will no longer be followed.").

In *Dell Federal Systems*, unsuccessful offerors filed GAO protests, arguing, amongst other things, "that the Army should have engaged in discussions with offerors . . . as required by [DFARS] 215.306(c)[.]"  906 F.3d at 987-88 (footnote omitted).  As part of the agency's corrective action to resolve the protests, the agency decided it would reopen the procurement to conduct discussions, request new final proposals, and then issue a new award decision.  The cognizant contracting officer explained "that because the procurement was valued in excess of $100 million, the Army was likely required to [but did not] conduct discussions with offerors pursuant to DFARS 215.306(c)(1)."  *Id.* at 988.  Two of the initial awardees filed suit in this Court, seeking to enjoin the corrective action.  *Id.* at 989.  On appeal, the Federal Circuit upheld the agency's corrective action, holding that, pursuant to DFARS 215.306, "discussions normally are to take place in these types of acquisitions."  *Id.* at 995-96.  Thus, the Federal Circuit "determine[d] that the corrective action of conducting discussions is rationally related to the *undisputed procurement defect of originally failing to conduct pre-award discussions. . . .*"  *Id.* (emphasis added).[22]  Indeed, the government plainly confessed the procurement error before the Federal Circuit, arguing that "[u]nless the Army conducts the discussions required by DFARS 215.306 under the facts of this case, the awards will be the result of a flawed procurement process."  Reply Brief of Defendant-Appellant United States, *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018) (Nos. 17-2516, 17-2535, 17-2554), 2018 WL 790985, at *13; *see id.* at *19 ("The regulatory expectation in this procurement was that the Army would conduct discussions and the record shows that the agency had no reason not to do so.").

Accordingly, the Court in this case asks whether the Agency has sufficiently justified its decision not to engage in discussions.[23]  The Agency's analysis – at least as

---

[22] Although the DFARS provision at issue employs the word "should" when delineating an agency's obligation to engage in discussions in a procurement in excess of $100 million, the Federal Circuit specifically quoted the Supreme Court's decision in *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018), for the proposition that "[t]he word 'shall' generally imposes a nondiscretionary duty."  *Dell Fed. Sys.*, 906 F.3d at 995-96.  Nevertheless, the Federal Circuit recognized – based on FAR 2.101's definition of the operative term "should" as well as GAO precedent – "that DFARS 215.306(c)(1) is reasonably read to mean [only] that 'discussions are the *expected course of action* in [Department of Defense] procurements valued over $100 million[.]'"  *Id.* at 996 (emphasis in original) (quoting *Sci. Applications Int'l Corp.*, B-413501, 2016 CPD ¶ 328, 2016 WL 6892429, *8 (Nov. 9, 2016)).

[23] *See Flight Safety Int'l v. United States,* No. 15-1010C, ECF No. 12 (Fed. Cl. Sept. 15, 2015) (unpublished order), at *1–*2 (agreeing with the plaintiff's argument that DFARS 215.306(c)(1) "which contains the word 'should,' occupies the ground somewhere between 'may' and 'must' and in light of this wording there must be reasonableness on the part of the Agency not to conduct discussions").

contained in the administrative record, as filed – falls woefully short.  The only germane discussion in the record the Court could locate is contained in a single paragraph in the POM/PNM.  *See* AR 3424 (Section VII, ¶ 1 ("Award without discussions")).  That paragraph, however, nowhere explains why discussions would be inappropriate in the circumstances of this procurement, but rather merely repeats, with different wording, the best value analysis undergirding the selection of F3EA, generally.  *Compare id. with* AR 3424 (Section VII, ¶ 2 ("Source Selection Decision")).  Moreover, the POM/PNM references a recommendation from the "Source Selection Advisory Council (SSAC)" that "F3EA Inc. be awarded the SOF RAPTOR IV contract without discussions[,]" AR 3424, but the Court could locate no further analysis on the subject in the administrative record, and the government cites to none.

A briefing from the SSEB to the SSAC notes that "[t]he PCO determined that it is in the Government's best interest to award without discussions[,]" AR 4941, but that conclusory statement is plainly insufficient to satisfy DFARS 215.306.  Indeed, while the SSEB briefing cites putative regulatory and statutory authorities for the proposition "that award can be made on the basis of proposals received 'without discussions[,]'" the briefing critically omits any mention of, and consequently fails to deal with the requirements of, DFARS 215.306.  AR 4941 (citing FAR 15.306(a)(3), 10 U.S.C. § 2305(b)(4)(A)(ii), and 41 U.S.C. § 3703(a)(2)).  Even more troubling still, the SSAC Memorandum for Record, dated December 9, 2019 – provided to the Court for the first time pursuant to the Court's May 20, 2021 order – does not even mention the discussions issue, despite the POM/PNM's apparent reliance on that Memorandum.  *See* AR 4966.  Finally, to make matters worse, the POM/PNM is inexplicably dated October 2018 in a footer across the bottom of each page of that document, while the SSEB briefing is dated October 2019, further begging the question of precisely when – and on what basis – the Agency decided not to conduct discussions.

Although the SSEB briefing document relies upon FAR 15.306(a) – which covers "[c]larifications and award without discussions" – DFARS 215.306 quite clearly takes precedence in acquisitions exceeding $100 million.  906 F.3d at 995-96.  If anything, then, the Agency got the proper framework completely backwards because the DFARS provision makes conducting discussions the default absent a justification to the contrary.  *Id.*  The Source Selection Plan ("SSP") confirms the Court's suspicion that the Agency improperly reversed the regulatory presumptions.  The SSP directs that "[i]f the solicitation states the Government intends to award without discussions and it is later determined that discussions are necessary, review and approve the PCO's written rationale (see FAR 15.306(a)(3))."  AR 1619.  But the default rule in acquisitions exceeding $100 million favors discussions.  The required rationale, therefore, is not to

justify why "discussions are necessary" but rather why they are unwarranted.  The SSP reversed that analysis.  While the Agency acknowledged that "[f]or acquisitions with an estimated value of $100 million or more, per DFARS 215.306(c)(1), contracting officers *should* conduct discussions[,]" the Agency apparently concluded, incorrectly, that FAR 15.306(a) takes precedence.  AR 1620 (emphasis added) (noting that "[i]f the solicitation states the Government intends to award without discussions, determine *whether discussions are necessary* after reviewing proposal evaluation results" and that "[i]f discussions are determined to be necessary, document the rationale and submit it to the SSA for review and approval" (emphasis added)).

In sum, none of the aforementioned documents in the administrative record reflect that the Agency ever considered during the procurement the requirement of DFARS 215.306 that "discussions normally are to take place in these types of acquisitions."  906 F.3d at 995-96.  If anything, the Agency incorrectly presumed that the default position favored not conducting discussions.  Given the facts of this procurement – *i.e.*, where all offerors or nearly all offerors submitted non-compliant proposals – the Agency should have conducted discussions.[24]

The government argues, however, that the Solicitation put the "offerors squarely on notice of the Government's intent to award the contract without discussions but reserved the right to do so in the 'sole discretion' of the contracting officer."  Def. MJAR at 56 (citing AR 1706, 1708).  The government is correct that "[t]he solicitation did not reference DFARS []215.306, either expressly, or by incorporation[,]" Def. MJAR at 57, but the DFARS provision is a binding regulatory requirement, not a solicitation provision or contract clause that needs to be (or even should be) incorporated in an RFP.  Thus, the government's assertion that the DFARS provision "was not included in the solicitation" is inapposite.  *Id.*

Moreover, contrary to the government's arguments, the *Blue & Gold* waiver rule[25] presents no obstacle to OGT's claim because the Federal Circuit implicitly concluded

---

[24] Defense Federal Acquisition Regulation Supplement; Discussions Prior to Contract Award (DFARS Case 2010-D013), 75 Fed. Reg. 71647-01, 71648 (Nov. 24, 2010) (explaining that "failure to hold discussions in high-dollar value, more complex source selections has led to misunderstandings of Government requirements by industry and flaws in the Government's evaluation of offerors' proposals, leading to protests that have been sustained, and ultimately extending source-selection timelines. DoD proposes to decrease the possibility of this outcome by making such discussions the default procedure for source selections for procurements at or above $100 million.").

[25] In *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), the Federal Circuit established this doctrine "to prevent contractors from taking advantage of the government,

that there is no inherent contradiction between the DFARS provision and solicitation language cautioning that an agency may not conduct discussions.  The government knows this to be the case because it took the opposite position in *Dell Federal Systems* of the one it takes here.  The solicitation at issue in that case similarly provided that the Army "intend[ed] to award without conducting discussions with Offerors" and that "the Government reserve[d] the right to conduct discussions and to permit Offerors to revise proposals if determined necessary by the Contracting Officer."  *Dell Fed. Sys., L.P. v. United States,* 133 Fed. Cl. 92, 98 (2017) (alteration in original) (administrative record citations omitted).  While Dell contended that, in light of such solicitation language, the government erred in taking corrective action to conduct discussions in compliance with DFARS 215.306, the government, at great length, urged this Court conclude that DFARS 215.306 must be followed and that the solicitation language posed no conflict:

> [Dell] asserts that "[t]he Army overrode the DFARS' preference [for discussions] when it clearly communicated to offerors, through the [solicitation's] plain language, its contrary preference *not* to conduct discussions."  Dell Cross-MJAR at 13 (emphasis original); *see also* GovSmart Inc. Cross-MJAR at 11-13 (same).  This circular argument ignores the requirement that there be a reasonable basis underlying the Army's decision not to conduct discussions.  As an initial matter, Dell's assertion that the Army made its final decision to forego discussions at the time of the solicitation is not accurate.  While the solicitation stated a preference for not conducting discussions, it clearly left that possibility open. . . .  The record therefore reflects that the Army's final decision to forego discussions was made well after the solicitation was published.  In any event, simply expressing a preference for not following an expected course of action does not, in and of itself, foreclose inquiries into whether a reasonable basis exists upon which that preference rests.  If that were the case, then an agency could forego taking any expected course of action just by stating that it did not want to, and without having to ever justify that decision.  The important point is

---

protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact."  *Id.* at 1313–14 (citation omitted).

> that, while DFARS 215.306 does not eliminate the agency's
> discretion to forego discussions, it remains that there must be
> a reasonable basis for the exercise of that discretion.

Redacted Resp. and Reply Brief of Defendant United States, *Dell Fed. Sys., L.P. v. United States*, 133 Fed. Cl. 92 (2017) (Nos. 17-465, 17-473), at *4-*5 (internal citations omitted).

Moreover, the government in *Dell Federal Systems* took the position that *Blue & Gold* was inapplicable (and not merely because the government's decision to engage in discussions pursuant to DFARS 215.306 was part of corrective action):

> In any event, plaintiffs and plaintiff-intervenors insistence
> that GAO would have dismissed the protests on timeliness
> grounds is belied by the administrative record.  As we
> discussed above, although the Army announced an intent to
> award without discussions, the solicitation clearly left the
> possibility open. . . .While the solicitation announced an intent
> to forego discussions, the Army was required to act
> consistently with DFARS 215.306 and only do so [*i.e.*, forgo
> discussions] if a reasonable basis existed.  *Unsuccessful offerors
> would likely be able to challenge the Army's final decision – made
> after the close of the solicitation – to make award decisions without
> discussions.*

*Id.* at *9 (emphasis added).  The government's sudden change of heart due to the exigencies of this case is not persuasive.

On the merits, the Court further rejects the government's argument that the DFARS provision at issue is nothing more than an unenforceable "recommendation" and somehow "is not mandatory[.]"  Def. MJAR at 57.  This position is simply untenable in light of the government's having persuaded the Federal Circuit to adopt the opposite view in *Dell Federal Systems*, 906 F.3d at 996 (finding "undisputed procurement defect of originally failing to conduct pre-award discussions, as reasonably interpreted by the agency to be required by the applicable regulations, in the first instance").

F3EA advances a more creative argument, contending that *Blue & Gold* bars OGT's protest ground regarding DFARS 215.306 because the government failed to include in the solicitation the correct FAR provision:  FAR 52.215-1 Alternate I.  *See* Intv. MJAR at 34-36 & n.25.  According to F3EA, the proper way for agencies to implement

DFARS 215.306 is to follow DFARS 215.209, which provides that "[f]or source selections when the procurement is $100 million or more, contracting officers should use the provision at FAR 52.215-1, Instructions to Offerors—Competitive Acquisition, with its Alternate I."  DFARS 215.209(a).  In that regard, pursuant to the Defense Department's Final Rule implementing DFARS 215.306 and DFARS 215.209,  "[u]se of the [FAR 52.215-1] clause without Alternate I will not accomplish the stated objectives; only the clause with its Alternate I will accomplish the purpose of this case."  Defense Federal Acquisition Regulations Supplement; Discussions Prior to Contract Award (DFARS Case 2010-D013), 76 Fed. Reg. 58150-01, 58152 (Sept. 20, 2011).  Thus, F3EA's argument is that because "the solicitation includes *standard* FAR 52.215-1 (*without* Alternate I), the solicitation reflects on its face that the agency has exercised its discretion *not* to implement the policy in DFARS 215.306(c)(1) to the procurement."  Intv. MJAR at 34 (emphasis in original) (citing *Blue & Gold*, 492 F.3d at 1313, and arguing that "[a] party who fails to object to the terms of a solicitation prior to the date for proposal submissions waives its ability to raise the objection later in a bid protest").

F3EA's point is not without merit, but, on balance, the Court concludes that F3EA's reading is in unacceptable tension with the Federal Circuit's decision in *Dell Federal Systems*.  F3EA argues at length (albeit in a footnote) that *this Court* "did not decide the meaning of DFARS 215.306 but rather just that the agency's interpretation of said regulation to justify corrective action was not completely irrational."  Intv. MJAR at 36 n.25 (citing 133 Fed. Cl. at 103–4).  The problem, of course, is that *Dell Federal Systems* addressed solicitation language substantially identical to that at issue here.  Indeed, in that case, "the RFP incorporated FAR 52.212-1(g), which established an expectation that the Army would award contracts without discussions: 'In accordance with FAR 52.212-1 . . . the Government intends to award without conducting discussions with Offerors.'" Redacted Cross-MJAR of Plaintiff Dell Federal Systems, L.P., *Dell Fed. Sys., L.P. v. United States*, 133 Fed. Cl. 92 (2017) (Nos. 17-465, 17-473), at *5; *id.* at *13 ("The Army overrode the DFARS' preference when it clearly communicated to offerors, through the RFP's plain language, its contrary preference not to conduct discussions.").

Accordingly, what is clear to this Court is that F3EA makes the very same argument *the Federal Circuit* itself implicitly rejected in *Dell Federal Systems*.  *Compare* Intv. MJAR at 35 ("[T]he RFP here conflicted on its face with an intent to conduct discussions pursuant to the policy at DFARS 215.306(c). . . . The RFP reflected that the preference for discussions in DFARS 215.306(c) was not being applied in this procurement.") *with Dell Fed. Sys.*, 906 F.3d at 996 ("We determine that the corrective action of conducting discussions is rationally related to the *undisputed procurement defect of originally failing to conduct pre-award discussions*, as reasonably interpreted by the

agency *to be required by the applicable regulations*, in the first instance." (emphasis added)). F3EA does not adequately address the Federal Circuit's holding, beyond attempting to distinguish it on the grounds that the case involved corrective action. But the Federal Circuit affirmatively agreed with the agency's conclusion in *Dell Federal* that the failure to conduct discussions was an "undisputed procurement defect." 906 F.3d at 996; *see also id.* at 995 (quoting *Alfa Laval*, 175 F.3d 1368, for the proposition that "an agency is bound by the 'applicable procurement statutes and regulations'" – referring to DFARS 215.306(c)(1)).

Finally, F3EA overreads the explanatory language in the Defense Department's issuance of the Final Rule. Defense Federal Acquisition Regulations Supplement; Discussions Prior to Contract Award (DFARS Case 2010-D013), 76 Fed. Reg. 58150-01, 58151 (Sept. 20, 2011). In that regard, F3EA's reliance on the following language from the Final Rule is from the section addressing the Defense Department's compliance with the "Regulatory Flexibility Act":

> *There are no practical alternatives that will accomplish the objectives of the proposed rule.* When a solicitation includes the provision at FAR 52.215-1, Instructions to Offerors— Competitive Acquisitions, paragraph (f)(4) of the clause states that the "Government intends to evaluate proposals and award a contract without discussions." If, however, the solicitation includes FAR 52.215-1 with its Alternate I, then the revised paragraph (f)(4) states that the "Government intends to evaluate proposals and award a contract after conducting discussions with offerors whose proposals have been determined to be within the competitive range." Use of the clause without Alternate I will not accomplish the stated objectives; only the clause with its Alternate I will accomplish the purpose of this case.

Discussions Prior to Contract Award, 76 Fed. Reg. at 58151-52 (emphasis added). That language does not add the gloss to DFARS 215.306 that F3EA attributes to it. All that Federal Register language explains is that the standard FAR 52.215-1 reserves flexibility to an agency to award without discussions, while the referenced Alternate version prefers discussions, just as the DFARS provision requires. Quite obviously, a solicitation provision that explicitly prefers discussions necessarily better effectuates the regulatory preference for discussions embodied in DFARS 215.306. But that does not demonstrate the converse – *i.e.*, that a solicitation that permits award without discussions is patently inconsistent with the DFARS provision. Indeed, in the Final

Rule issuance itself, the Defense Department concluded that "[t]he rule does not duplicate, overlap, or conflict with any other Federal rules." Discussions Prior to Contract Award, 76 Fed. Reg. at 58151-52.

Moreover, the Court simply cannot attribute significant weight to the section of the Federal Register entry addressing the "Regulatory Flexibility Act," particularly given that the purpose of that section is not to provide an authoritative interpretation of the Final Rule itself, and, more importantly, because the Court cannot begin to understand the precise point the Defense Department was trying to make if F3EA's view is correct.  In that regard, the Defense Department's assertion that "[t]here are no practical alternatives that will accomplish the objectives of the proposed rule" is fundamentally inconsistent with F3EA's reading, to the extent that F3EA contends that Alternative I of FAR 52.215-1 would do just that.  Put differently, according to the F3EA's view of the Final Rule, DFARS 215.209 would accomplish the desired result for acquisitions exceeding $100 million, and thus DFARS 215.306 would be rendered superfluous.  This, the Court will not do.  *Baude v. United States*, 955 F.3d 1290, 1305 (Fed. Cir. 2020) ("The government's interpretation of the regulation 'is thus at odds with one of the most basic interpretative canons:' that a statute or regulation 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))).  Particularly in light of the Federal Circuit's decision in *Dell Federal Systems*, the Court cannot conclude that OGT's argument is untimely.

Finally, F3EA's view is refuted by the SSP, in which the Agency acknowledged, generally, the applicability of DFARS 215.306.  AR 1620.  If F3EA were correct, however, the SSP would have noted that the Agency was making an election not to follow the DFARS provision.  In short, the Agency itself did not believe that the ordinary FAR 52.215-1 clause is patently inconsistent with DFARS 215.306.  *Id.*

Where, as here, the Agency declined to conduct discussions without considering DFARS 215.306 – and given that regulation's strong preference for discussions in a procurement of this magnitude – OGT successfully has demonstrated success on the merits of its claim.  Discussions, of course, would have enabled OGT (and presumably all of the offerors) to fully revise their respective proposals to address any deficiencies in a final proposal revision.

### C.   The Agency Failed To Sufficiently Investigate Allegations Of A Procurement Official's Improper Conduct

OGT argues that the Agency insufficiently investigated OGT's allegations that [RM] improperly influenced the procurement in favor of F3EA.  Compl. at 60–67.  OGT contends that the administrative record supports a finding of PIA violations, *see* 41 U.S.C. ch. 21,[26] the existence of OCIs (biased ground rules and unequal access to information), *see* FAR subpart 9.5, and violations of FAR 1.602–2 and FAR 3.101-1.  Pl. MJAR at 18–40.  The government counters that none of these provisions apply to the case at hand and that, in any event, OGT "fails to overcome the 'strong' presumption that the contracting officer investigated its OCI allegations and found them to be without merit."  Def. MJAR at 58–70 (quoting *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 568–69 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013)).  While the Court agrees with the government that neither the allegations nor the record in this case support a PIA or OCI violation, the Court agrees with the OGT that the Agency did not adequately investigate possible violations of FAR 1.602-2 and FAR 3.101-1, including serious questions of bias or improper conduct impacting the fairness and integrity of this procurement.

The basis for all of the aforementioned allegations are emails from two former F3EA employees, [TI] and [RS], that OGT provided to GAO and the Agency.  AR 25–26, 854–55.  Those emails disclosed as follows:

> The three Task Orders I was referring to are the Crisis Response Force Exercise (CRF-Ex), Unconventional Warfare (UW), and Sensitive Activities (SA). The language in each was almost verbatim from the previously executed TOs under SR III wherein [*   *] wrote the SOW for the supported unit to ensure it include the verbiage he intended to be a part of the SR IV solicitation. As for the Soldier Tracking System (STS) TO, I just spoke to a friend and former F3EA employee that confirmed he wrote at least some of the language that appeared in that STO for the solicitation. He was also present for several conversations between [*   *] and [RM], during which the intent for F3EA to 'get the work' and other points of supporting a supporting information exchange were discussed.

---

[26] *See also* FAR 3.104 (Procurement integrity).

* * * *

>During my employment at F3EA, I participated in a series of conference calls that contained references to F3EA being the vendor of choice for [RM] and during these calls it was made clear that some degree of assistance would be given to F3EA in order to weigh the SOF Raptor competition in F3EAs favor. I was also privy to a series of comments made by F3EA leadership in front of other employees and potential SOF Raptor Teammates that [RM] and other USG rep's would make sure that F3EA had a strong advantage. These advantages came in the form F3EA being able to write the SME position descriptions and qualifications for STOs1-3. Myself and atleast [sic] 3 other employees participated in writing these requirements and immediately recognized the verbiage and terminology used in the SOF Raptor solicitation. [*   *   *]. It was also assumed that only only [sic] F3EA would be able to provide historic AARs and RMTs (that supported STOs 1-3) that would support the solicitation requirement and that these documents would be used to further deter competition. [*   *   *].

AR 2312, 2386–87.

The PIA statute, codified at 41 U.S.C. §§ 2101–2107, prohibits federal government officials from "knowingly disclos[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract on which the information relates."  41 U.S.C. § 2102(a)(1).  FAR 9.505 prohibits offerors from "prepar[ing] . . . a work statement to be used in competitively acquiring a system" and instructs offerors to avoid access to information that that "is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract."

To the extent that F3EA was involved in crafting task orders for SOF RAPTOR III, on which it was an incumbent contractor, and even if those task orders were selected as STOs for SOF RAPTOR IV for the benefit of F3EA, OGT fails to sufficiently allege that [RM] disclosed "contractor bid or proposal information" or "source selection information" from the present SOF RAPTOR IV procurement as prohibited by 41 U.S.C. § 2102.

For similar reasons, OGT's OCI allegations fail.  Any possible advantage that F3EA may have had in responding to the sample task orders selected for SOF RAPTOR IV as a result of its performance of SOF RAPTOR III is a natural advantage of incumbency.  "Incumbent status, without more, typically does not constitute 'unequal access to information' for purposes of showing an OCI."  *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 772 (2006).  GAO decisions similarly confirm that "the government is not necessarily required to equalize competition to compensate for such an advantage, unless there is evidence of preferential treatment or other improper action."  *Superlative Tech., Inc.*, B-415405.2, 2018 CPD ¶ 19, 2018 WL 585679, *5 (Jan. 5, 2018); *see also Lovelace Sci. & Tech. Servs.*, B-412345, 2016 CPD ¶ 23, 2016 WL 359122, *8 (Jan. 19, 2016); *QinetiQ N. Am., Inc.*, B-405008.2, 2011 CPD ¶ 154, 2011 WL 357875, *9 (July 27, 2011).

This, however, does not end the Court's inquiry because the above-quoted emails also raised allegations that [RM] specifically conducted the procurement in a manner that would favor F3EA.  *See* FAR 9.508 (providing that the FAR does not provide an "all inclusive" list of all possible conflicts of interests); *see also Harkon, Inc. v. United States*, 133 Fed. Cl. 441, 461–66 (2017).  While these allegations may not fit squarely within a PIA or OCI framework, they certainly raise questions regarding whether the procurement was "conducted in a manner above reproach and . . . with complete impartiality and preferential treatment for none[.]"  FAR 3.101-1.  This FAR provision further instructs that "[t]he general rule is to avoid strictly any conflict of interest *or even the appearance of a conflict of interest in Government-contractor relationships*." FAR 3.101-1 (emphasis added); *see also* FAR 1.602-2 ("Contracting officers shall . . . ensure that contractors receive impartial, fair, and equitable treatment[.]").[27] Indeed, these objectives are so central to the procurement system as a whole that even the mere appearance of impropriety can be sufficient grounds to disqualify an offeror. *See NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376–77 (Fed. Cir. 1986).

---

[27] Department of Defense guidance also reflects the types of concerns that OGT raises here.  *See* DOD Contracting Officer's Representative Handbook, at 23–24 (Mar. 22, 2012), *available at* https://www.acq.osd.mil/dpap/cpic/cp/docs/USA001390-12_DoD_COR_Handbook_Signed.pdf (explaining that "[p]rivate firms must be able to compete for the Government's business on a scrupulously fair basis" and that "increas[ing] the prospects for award to another vendor is an obviously unfair practice"); *see also* Department of Defense Office of Inspector General, Report No. D-2008-094, at 20–21 (May 20, 2008), *available at* https://media.defense.gov/2019/May/13/2002131090/-1/-1/1/DODIG-2008-094.PDF (investigation report finding "a pattern of behavior that gave an advantage to [a particular contractor] in competing for the contract and so constituted preferential treatment" in violation of FAR 3.101).

As with all agency decision-making, the Court must analyze whether the Agency conducted an adequate investigation consistent with the arbitrary and capricious standard of review. *See PAI Corp. v. United States*, 614 F.3d 1347, 1352–53 (Fed. Cir. 2010) (reviewing conflict of intertest investigation under APA standard); *cf. Former Emps of Ameriphone, Inc. v. United States*, 288 F. Supp. 2d 1353, 1355 (C.I.T. 2003) ("Courts have not hesitated to set aside agency determinations which are the product of perfunctory investigations." (footnote omitted)).  Notwithstanding the significant discretion vested in procurement officials, this Court must ascertain whether there exists a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted).  For the reasons explained below, the Court is greatly troubled by the Agency's circumscribed investigation and, even more so, by the facts that came to light as a result of this bid protest action. *See PCCP Constructors, JV*, B-405036, 2011 CPD ¶ 156, 2011 WL 3510746, *18 (Aug. 4, 2011) ("In our view, the agency's failure to reasonably investigate the OCI taints the integrity of the procurement process.").

*First*, as part of the Agency's investigation into OGT's allegations, the PCO reviewed written statements that four individuals involved in the evaluation process submitted to the Agency and conducted two in-person interviews. AR 2041–44.  They all categorically denied that F3EA was involved in any way in selecting the STOs for the SOF RAPTOR IV RFP and that they never saw or heard any action that would lead them to believe that [RM] was steering the award to F3EA. *Id.*  [RM] also submitted a written statement, in which he issued similar blanket denials. AR 2044–45.  While such efforts are certainly the start of a reasonable investigation, this is where the Agency *decided to conclude* its investigation.  The Court holds that the failure to do more was insufficient under the facts of this case. *Cf. AAR Mfg., Inc. v. United States*, 149 Fed. Cl. 514, 529 (2020) (describing a reasonable OCI investigation and rejecting the plaintiff's assertion that the contracting officer "merely rubber-stamp[ed] rote affidavits").  In particular, the Agency should have, but never, interviewed either F3EA [* * *], who was mentioned by name in the allegations, or, more critically, *the two former F3EA employees who raised the allegations*.  The PCO in his May 1, 2020 PIA memorandum, observed that the allegations "did not provide a timeline of when the statements and discussions occurred, the topics of the discussion and who were other parties that were present." AR 2569–72.  This is certainly an appropriate observation for an investigator to make but begs the question why the Agency *did not follow-up with the individuals making the allegations*.  Rather than conducting any follow-up, the Agency summarily closed the investigation, reflecting a lack of curiosity that could only be described as ostrich-like.  In an investigation that counsel of record for the government framed as "com[ing] down to a credibility question," *see* ECF No. 45 ("Oral Argument Tr.") at

118:8, it is inadequate, at best, and sloppy, at worst, not to interview (or at least attempt to interview) the individuals who made the allegations.  In that regard, the government could not explain how a credibility determination – which, by definition, is relative when dealing with two mutually exclusive versions of the facts – can be made by talking to only one set of putative witnesses.  *See id.* at 118:5–127:20.

*Second*, the Court's further review of the final, corrected administrative record revealed that [RM] played multiple roles in the procurement and that he reviewed his own work.  For the past performance volume of the proposal, offerors were permitted to submit five contracts that were evaluated for relevancy and confidence.  AR 1700, 1715–16.  Offerors also were required to submit a completed PPQ for each past performance contract reference.  AR 1701.  F3EA submitted [*  *  *] previously completed contract references from the incumbent SOF RAPTOR III vehicle.  AR 3246–48, 3358.  *The PPQs and the additionally provided contractor performance assessment reporting system ("CPARS") reports for F3EA all were provided by [RM]*.  AR 3246–48.  On all five CPARSs, [RM] rated F3EA "exceptional" in every category and provided glowing narratives of F3EA's work on the SOF RAPTOR III.  AR 3278–91, 3329.  All the PPQs were rated "outstanding" for every section of each contract and, likewise, provided glowing narrative.  AR 3292–3324.  All of these documents formed the basis for F3EA's past performance volume evaluation that was conducted by a team of SOF RAPTOR IV evaluators, which reported to the SSEB Chair, [RM].  AR 1631.

This case is far more concerning than other cases where courts declined to find any impropriety.  In *Galen Medical Associates, Inc. v. United States*, for example, the Federal Circuit held that the plaintiff failed to demonstrate the appearance of a conflict of interest based on allegations that an evaluation panel member was also listed as a potential past performance reference, with whom the agency might consult.  369 F.3d 1324, 1335 (Fed. Cir. 2004).  In that case, however, the Federal Circuit emphasized that there was no evidence that the evaluator "had been contacted and agreed to serve as a past-performance reference" and, therefore, "the mere fact that [the offeror] listed an evaluator as a past performance reference does not constitute a conflict of interest."  *Id.* at 1336–37.  In *EFW, Inc. v. United States*, a case with facts slightly more analogous to the instant one, this Court held that the plaintiff failed to show improper conduct where a member of the SSEB also authored a PPQ for one of the seven contracts that the offeror submitted in its past performance volume.  148 Fed. Cl. 396, 405–06 (2020).  But, in that latter case, the SSEB member only "evaluated *a single* prior contract" and, more importantly, he only rated the offeror "with a 'Satisfactory' technical performance evaluation."  *Id.* (emphasis added).

Both of these cases stand in stark contrast to the instant case for the simple reason that in *Galen Medical* and *EFW* the respective court was at least able to discern based on the particular facts why there was no material conflict or appearance of a conflict.   Here, however, F3EA submitted five past performance contract references in its proposal.   And, for each of those five contracts, SSEB Chair [RM] provided the very PPQs in which he rated F3EA as "outstanding" in every category.   AR 3292–3324.   Then, as the SSEB Chair, [RM] oversaw the evaluations of F3EA, which included the evaluation of F3EA's proposal, including its past performance volume containing [RM's] completed PPQs.   Whether or not this structure and process constituted an actual (prohibited) conflict of interest, the circumstances certainly warranted a more detailed and thorough investigation in light of the allegations for which there were hard facts provided to the Agency (and the GAO).

*Third*, and most troubling, is the Agency's total obfuscation of [RM's] role in this procurement.   Until late in this litigation, the Court had been working with the premise of OGT's allegation that [RM] was the contracting officer representative ("COR") for SOF RAPTOR III and a point of contact somehow involved with SOF RAPTOR IV, but the Court and presumably OGT were unsure about his precise role.[28]   Indeed, even the government's counsel asserted that they did not know what [RM's] precise role was in the procurement at issue, as evident from the following exchange during oral argument:

| | |
|---|---|
| THE COURT: | Well, was [RM] on the evaluation team as well in any capacity? |
| MR. PIXLEY: | I don't think the record establishes that…. |
| THE COURT: | Do you know? |
| MR. PIXLEY: | I do not know. |
| THE COURT: | Does agency counsel know? |
| MR. PARENT: | No, you honor. |

---

[28] *See* AR 25-26; Pl. MJAR at 1 (referring to [RM] as the COR for SOF RAPTOR III).   The FAR defines COR as "an individual, including a contracting officer's technical representative (COTR), designated and authorized in writing by the contracting officer to perform specific technical or administrative functions."   FAR 2.101.

Oral Argument Tr. at 122:15–122:22.  The government emphasized – erroneously, as it turns out – that regardless of whatever role [RM] may have played in the evaluations, "there was a separate source selection evaluation board."  *Id.* at 122:25–123:1.

Further review of the administrative record, however – particularly after the government filed its May 25, 2021, corrected version of that record – uncovered that [RM] was most certainly involved in the evaluations; as noted above, *he was the SSEB Chairperson*.  AR 1631.  As such, he was charged with writing the PER containing "the adjectival assessments for each factor and subfactor as well as a Cost/Price report and the supporting rationale."  AR 1627.  Furthermore, he was essentially in charge of all the evaluators (including [JL], [GH], [ZH], and [MD]) and the capability factor chairperson ([JS]) – all of whom provided written statements or were interviewed as part of the Agency's limited investigation of OGT's allegations regarding [RM].  AR 1627, 1631.  The Court finds it quite disturbing that this critical detail was omitted from the investigation memoranda.  *See* AR 2037–46, 2569–72.  Moreover, this most certainly raises serious questions regarding the propriety of [RM's] submitting PPQs on behalf of F3EA and then objectively "adjectively assess[ing]" his own work.  AR 1627.

It only gets worse from here.

In a sworn declaration submitted to GAO as part of OGT's second protest, [RM's] second line supervisor averred that "[she] saw no indication that he acted improperly during the source selection process."  AR 3530.  She then added that "[h]owever, for un-related reasons, I had another Government employee conduct an independent evaluation of the proposals for [SOF RAPTOR IV] which resulted in the updated Proposal Evaluation Report."  *Id.*  She did not elaborate on the nature of the "un-related reasons" for the updated PER, nor was it readily apparent from the administrative record.  After the Court ordered the government to provide any additional documents relating to "[RM's] role in the procurement at any stage[,]" however, the government provided, *without any explanation for its original omission*, an April 30, 2020, letter, terminating [RM's] role as SSEB Chair.  ECF No. 56.  That termination letter is decidedly unhelpful for the government.

From that termination letter – ***provided for the first time in response to the Court's May 28, 2021 order*** – the Court learned the following:

> This termination is the result of *repeated inconsistencies within multiple revisions of the Proposal Evaluation Report (PER), including significant findings being omitted that were documented in the consensus roll up. These omissions resulted in incomplete*

> *evaluation review by the Source Selection Advisory Council and (SSAC) and SSA and incomplete evaluation information being provided to the Offerors during the debriefing.* As a result of multiple Government Accountability Office protests, *the Procuring Contracting Officer initiated corrective actions to review and amend the PER to ensure that the solicitation criteria was followed. The corrective action was to add the omitted information into the PER, review the findings for compliance and determine if the ratings assessed were still relevant considering the additional information. Each subsequent version of the PER has had significant areas of disagreement between the documented findings and the solicitation requirements or areas where the proposal citations do not support the rating that was assessed.* The fact that these areas seem to persist with every new version of the PER has led to the conclusion that appointment of a new SSEB Chairperson is necessary.

AR 5388 (emphasis added).

Of course, given that this letter was not included in the administrative record until after all of the briefing, oral argument, and status conferences were concluded, the Court still has no idea what "significant findings [were] . . . omitted" or precisely what "incomplete evaluation information [was] . . . provided to the Offerors during the debriefing" or how the final version of the PER differed (if at all) from earlier versions and revisions in which [RM] had a role. *Id.* This disturbing document – produced way too late in the day for this litigation – certainly casts a long shadow over [RM's] conduct in his role as SSEB Chair during this procurement, lends more than a modicum of support to the allegations of F3EA's former employees, and was not addressed by either the PCO's investigation memoranda or counsel of record in this case. *See* AR 2037–46, 2569–71.

Moreover, [RM] himself omitted critical details from his declaration submitted to the GAO as part of the second protest (B-418427.6). AR 3842. In that declaration, [RM] described himself as the COR for SOF RAPTOR III, as well as having "played a role in the development and coordination of the [SOF RAPTOR] IV re-competition effort." *Id.*[29]  Given OGT's allegations, however, [RM] effectively concealed his central role in the SOF RAPTOR IV evaluation process.  That his role was significant is evident by the

---

[29] Similarly, the government's administrative record index describes [RM] as merely an "Assistant Project Manager."  ECF No. 23 at 5; ECF No. 56 at 5.

fact that the Agency determined that it was compelled to remove him from his position as SSEB Chair and to redo his work in whole or part.  The obfuscation of these facts is unacceptable.

The fact that the Agency removed [RM] from his role as SSEB Chair is yet further complicated by the apparent failure of the Agency to implement fully the corrective action to which the Agency committed itself before the GAO.  In particular, although the Agency represented to GAO that, as part of corrective action, "[t]he Army will *reevaluate* proposals consistent with the solicitation, determine the impact of the *reevaluations* on the source selection decision, and document its *reevaluation*[,]" AR 348 (emphasis added), the Agency apparently did no such thing.  In that regard, the SSAC Chairperson's memorandum, dated August 21, 2020, mischaracterized the Agency's commitment to GAO as follows:

> As a result of the information contained in the protest documents, the PCO petitioned the GAO to dismiss the protests based on the fact that the Government *would review the evaluation and take corrective action as necessary* to ensure that the evaluation was conducted in accordance with the solicitation requirements.

AR 3343 (emphasis added).  But the Agency committed to GAO to do something far more specific than a vague undertaking of "corrective action as necessary."  *Id.*  Rather, the Agency committed to reevaluate proposals.  A reevaluation of proposals strikes the Court as legally and factually quite different than merely conforming the PER to the underlying, original evaluations, which seems to be all that the Agency did, as the PCO noted in the same memorandum:

> As a result of the corrective action, *the PER was updated to reflect an accurate representation of the evaluation of the Offerors proposals inserting additional findings and ensuring that the findings were consistent with the evaluation criteria outlined in the solicitation*.

AR 3343-44 (emphasis added); *compare id. with* AR 1626-27 (describing complete evaluation process).

48

A similar characterization of the Agency's actual "corrective action" is contained in the source selection decision document:

> As a result, the PCO initiated corrective actions and arranged for an independent review of the evaluation. *It was found that there were findings in the consensus roll ups that were not carried forward into the original PER. All PER information was reviewed and updated to reflect the additional information.*

AR 3350 (emphasis added) (noting that "the update did not change the award decision").

The Court holds that updating the PER plainly is not the same as reevaluating proposals.  Had the Agency fully implemented its promised corrective action, perhaps it could have avoided this protest.  Instead, the Court is left with yet further, unanswered questions regarding the Agency's conduct in this procurement and the role [RM] played in it.

\* \* \* \*

Given all of these facts – many of which should have been contained in documents filed as part of the original administrative record but which the Court was forced to order the government to provide – the Court concludes that the Agency's investigation into questions of improper conduct was patently insufficient and undermines the integrity of the procurement process and the award decision.  Indeed, the Agency's actual corrective action, as implemented, raises yet further concerns with regard to the initially filed administrative record.  The Court simply does not understand on what basis the government declined to include certain documents from the so-called "'first' evaluation of proposals (before the GAO protest and corrective action)" – as opposed to "the second evaluation" – given that *there was no reevaluation.* ECF No. 47 at 2.  Put yet differently, as far as the Court can tell, any and all documents relating to the so-called "'first' evaluation" would have been relevant to the so-called "second evaluation" because the only thing that changed was the PER and the updated Source Selection Decision.  *See* AR 3345, 3371 (updated Source Selection Decision noting that the SSAC "was briefed on 28 October 2019 to discuss evaluation progress" – which was part of the "first evaluation" as that term has been used by the government in this litigation).  That is, *the updated PER and SSDD relied upon the original evaluation.*  That is deeply disturbing, not only in terms of how the government shaped the administrative record here (and, apparently, before the GAO), but also in terms of the explanation the

government previously provided to the Court regarding the initial record omissions. The Court expects the government to address these concerns in detail.

## VI.   INJUNCTIVE RELIEF

The Tucker Act vests this Court to award "any relief that the court considers proper, including . . . injunctive relief." 28 U.S.C. § 1491(b)(2); *see* RCFC 65. In evaluating whether permanent injunctive relief is warranted in a particular case, a court must consider: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest. *PGBA v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

As this Court explained at length above, OGT has succeeded on the merits of its claims that the Agency acted in an arbitrary and capricious manner in evaluating F3EA's and Lukos' proposals, not conducting discussions, and failing to sufficiently investigate the conduct of SSEB Chairperson [RM] and whether he improperly influenced the procurement.

In evaluating irreparable harm, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993). In the bid protest context, "[a] lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm." *Magnum Opus*, 94 Fed. Cl. at 544. Moreover, "[t]he court has repeatedly held that the loss of potential profits from a government contract constitutes irreparable harm." *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 49 (2012) (internal quotation marks omitted). Here, OGT was denied the opportunity to fairly compete for this valuable single award IDIQ, which had a potential value of $245 million. The Court, thus, agrees that OGT will suffer irreparable harm in the absence of an injunction.

In balancing the harms, the Court ordinarily is required to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3); *see Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 368 (2009). The government, however, already has agreed that the Court "should make any relief ruling without regard to any cost or disruption from terminating, recompeting, or reawarding the challenged contract." February JSR at 2–3. The government reaffirmed this agreement in the parties' June 2, 2021 joint status report. June JSR at 2. The Court is likewise mindful that the parties also represented to the Court "given the United States assertions that an abrupt cessation

without a transition period could disrupt military readiness. . . .  [T]he parties will agree to cooperate to ensure a reasonable period of transition on any pending task orders that are being performed should there be a permanent injunction." *Id.*

Finally, the public interest favors this Court's granting an injunction, as "the public always has an interest in the integrity of the federal procurement system." *Starry Assocs., Inc. v. United States*, 127 Fed. Cl. 539, 550 (2016) (citing *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)); *see Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 429 (2018) ("An important public interest is served through conducting 'honest, open, and fair competition' under the FAR, because such competition improves the overall value delivered to the government in the long term." (quoting *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 495 (2013))); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system.").  This is particularly true where, as here, there are substantial allegations of impropriety, the Agency's investigation of those allegations was patently insufficient, and where the government apparently failed to implement the corrective action to which it had committed before the GAO.

## CONCLUSION

For the above reasons, the Court:  **GRANTS** both OGT's motion to amend its complaint and OGT's motion for judgment on the administrative record (including OGT's request for permanent injunctive relief); **DENIES** the government's motion to dismiss for lack of standing and motion for judgment on the administrative record; and **DENIES** F3EA's motion for judgment on the administrative record.

The Agency hereby is enjoined from proceeding with its contract award to F3EA, with the exception of already awarded task orders that currently are being performed. Given the defects in F3EA's and Lukos' respective proposals identified above, the Agency's failure to conduct discussions, as well as the Agency's inadequate investigation into alleged wrongdoing by the SSEB Chair, the Court concludes that it has no choice but to order the Agency either:  (1) to resolicit this procurement from its inception; *or* (2) to reopen the procurement to conduct discussions and accept new final proposal revisions from offerors.  In either case, the Agency must conduct an entirely new set of evaluations, consistent with the Court's understanding of the corrective action the Agency committed to undertake before GAO.  In implementing either of these foregoing options, and to ensure compliance with FAR 3.101-1 and FAR 1.602-2, the Agency shall further consider and investigate OGT's allegations and the related

concerns the Court identified above, although the Court declines to superintend that process or otherwise provide detailed instructions to the Agency.

Finally, pursuant to RCFC 11 and this Court's inherent authority, the Court orders the government to show cause why monetary sanctions should not be imposed against Defendant for its piecemeal and improper handling of the administrative record in this matter.  The government shall specifically address the DCMA report regarding Lukos, AR 4993–5006, as well as the [RM] termination letter, AR 5388–89.  The government shall file a brief addressing this issue not to exceed ten (10) pages, double-spaced, 12 pt. Times New Roman font, **on or before August 17, 2021**.  OGT may file a response brief, subject to the same page length and formatting constraints, **on or before August 24, 2021**.  The Court expects OGT to address any prejudice it may have suffered by the late disclosure of the aforementioned documents and, in particular, the extent to which OGT was aware of the specific information contained in those documents during the pendency of the GAO protest.  The government may file a reply brief, subject to the same formatting constraints but not to exceed five (5) pages, **on or before August 31, 2021**.

**IT IS SO ORDERED**.

<u>s/Matthew H. Solomson</u>
Matthew H. Solomson
Judge