# In the United States Court of Federal Claims

No. 21-775C

(Filed Under Seal:  October 29, 2021)
(Filed:  November 3, 2021)

| | |
|---|---|
| **OAK GROVE TECHNOLOGIES, LLC,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| **and** | ) |
| | ) |
| **F3EA, INC.,** | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |

## OPINION AND ORDER[*]

*SOLOMSON*, **Judge.**

### I.   BACKGROUND

In the Court's decision on the merits of this case, the Court expressed the concern that the government's handling of the administrative record ("AR") "waste[d] judicial resources and undermine[d] trust in both the procurement and disputes processes." *Oak Grove Techs., LLC v. United States*, -- Fed. Cl. --, 2021 WL 3627111, at *13 (Aug. 2, 2021).  Accordingly, the Court ordered the government "to show cause why Defendant should not be sanctioned for wasting the Court's (and Plaintiff's) time and resources on these administrative record deficiencies."  *Id.*  In particular, pursuant to Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC") and this Court's inherent

---

[*] On October 29, 2021, the Court filed, under seal, this opinion and order and provided the parties the opportunity to propose redactions.  On November 3, 2021, the parties filed agreed-upon proposed redactions, ECF No. 91, which are incorporated, in full, in this public version of this opinion and order.

authority, this Court "order[ed] the government to show cause why monetary sanctions should not be imposed against Defendant for its piecemeal and improper handling of the administrative record in this matter." *Id.* at *32. The Court specifically instructed the government to address its omission of two documents from the originally filed administrative record: (1) a Defense Contract Management Agency ("DCMA") report regarding Lukos (also referred to in the record as "Offeror H"), AR 4993–5006; and (2) what has been referred to as "the [RM] termination letter," AR 5388–89, which documented the Agency's removal of the first Source Selection Evaluation Board ("SSEB") Chairperson from his role in the procurement at issue.[1] *Oak Grove,* 2021 WL 3627111, at *32.

Regarding the RM termination letter, the Court explained at some length why that document was significant to the litigation and why it left the Court "with yet further, unanswered questions regarding the Agency's conduct in this procurement and the role [RM] played in it," as well as concerns regarding the nature of the corrective action and the "explanation the government previously provided to the Court regarding the initial record omissions." *Oak Grove,* 2021 WL 3627111, at *30. The Court noted that it "expect[ed] the government to address these concerns in detail." *Id.*

On August 17, 2021, and August 24, 2021, respectively, the government and plaintiff, Oak Grove Technologies, LLC ("Oak Grove"), filed responses to the Court's order to show cause. *See* ECF No. 75 ("Def. Resp."); ECF No. 76 ("Pl. Resp."). Despite the Court's having highlighted particular concerns in its merits decision, as noted *supra,* the government did not address them "in detail" or otherwise. *Oak Grove*, 2021 WL 3627111, at *30.

On August 26, 2021, the Court held a status conference to discuss further proceedings in this matter. ECF No. 77. Following that status conference, the Court ordered the government to file a reply brief for two purposes: (1) to respond to the arguments in Oak Grove's brief; and (2) to explain specific representations the government made in its merits briefs regarding the substance of the Agency's corrective action at issue, which the RM termination letter appeared to contradict. ECF No. 78 ("August 27, 2021 Order"). The government filed its reply brief on September 7, 2021. ECF No. 83 ("Def. Reply").

On September 14, 2021, the Court held oral argument on the show cause order. ECF No. 89 ("Tr.").

After considering the parties' respective positions, the Court concludes that RCFC 11 warrants the imposition of sanctions on the government. The Court does not

---

[1] The Court's published decision redacted the name of that Agency employee, referred to as "RM."

hold individual government counsel responsible for the fact that several critical documents were originally omitted from the administrative record. That does not mean, however, that the United States, acting by and through the Department of the Army (the "Agency"), can be let off the hook. The facts of this case and its procedural history demand some form of accountability for the government's mishandling of the administrative record.

Given that the predicate for sanctions is detailed at length in the Court's earlier decision, *Oak Grove,* 2021 WL 3627111, at *9–*13, *28–*30, the Court repeats itself here only to the extent necessary to address the arguments in the briefing on the show cause order.

## II.   RCFC 11 GENERAL PRINCIPLES

The undersigned is hardly the first judge of this Court to consider whether sanctions are warranted, pursuant to RCFC 11, for the improper compilation of the administrative record. *See, e.g., Coastal Env't Grp., Inc. v. United States*, 118 Fed. Cl. 15, 36 (2014) (imposing Rule 11 sanctions related to misconduct involving the administrative record); *Gallup, Inc. v. United States*, 131 Fed. Cl. 544, 547 (2017) (declining to impose Rule 11 sanctions where United States Special Operations Command agreed to pay plaintiff's attorney fees and litigation costs, committed to issuing guidance on the importance of integrity when preparing the record, and had begun planning training to prevent future disclosure problems).[2] Federal district courts from coast to coast have similarly recognized the possibility of sanctions for administrative record compilation failures.[3]

The Court begins with the text of RCFC 11, which provides, in part:

> If, after notice and a reasonable opportunity to respond, the court determines that RCFC 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law

---

[2] In *Gallup*, the agency committed, specifically, that it would "issue guidance to its contracting staff emphasizing the importance of completeness, accuracy, and integrity in preparing records and accompanying certifications [and] is in the process of planning a training session . . . that will focus on issues of accuracy and ethics in preparing and certifying administrative records." 131 Fed. Cl. at 547 (quoting Dkt. No. 28, at 1–2).

[3] *See, e.g., Nat'l Urb. League v. Ross,* 2020 WL 5548117, at *5 (N.D. Cal. Sept. 15, 2020) (citing cases for the proposition that "failure to produce or complete an administrative record can be the basis for sanctions"); *New York v. Dep't of Com.*, 461 F. Supp. 3d 80, 94 (S.D.N.Y. 2020) (ordering government "to reimburse the NGO Plaintiffs for the expenses, including attorney's fees and costs, they reasonably incurred in addressing Defendants' production failures" with respect to an administrative record).

> firm, ***or party*** that violated the rule or is responsible for the violation.

RCFC 11(c)(1) (emphasis added). Thus, a party may be sanctioned even if its counsel is not.[4] RCFC 11(b), in turn, provides (in relevant part):

> By presenting to the court a pleading, written motion, ***or other paper*** — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the factual contentions have evidentiary support . . . .

RCFC 11(b)(3) (emphasis added).

In this case, the Agency's contracting officer "certif[ied] that to the best of [his] knowledge and belief, and after careful review," that the filed "documents constitute the record of the administrative actions performed in the above-referenced Solicitation that is relevant to the issues raised in the plaintiff's Complaint." ECF No. 23-1 at 1 (Certification of Contracting Office Administrative Record). This certification, and the filing of the administrative record generally, are subject to RCFC 11. *See Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1074 (Fed. Cir. 2002) (holding that the "obligation under Rule 11(b)(3) to conduct a proper prefiling investigation applies not only to the complaint but also to 'other paper[s]' filed in the case").[5] The government nowhere contends otherwise.

---

[4] "In imposing Rule 11 sanctions, a court may allocate sanctions between an attorney and client according to their relative fault." *Judin v. United States*, 110 F.3d 780, 785 (Fed. Cir. 1997). While "[a]ttorneys are usually held solely responsible for Rule 11 sanctions when the filing violating Rule 11 is unwarranted by existing law, or a good faith argument for extension, modification, or reversal of existing law[,] . . . an attorney and client may be held jointly and severally liable for filings that are not well grounded in fact." *Id.* (citing *Allen v. Utley,* 129 F.R.D. 1, 9 (D.D.C. 1990)); *see also, e.g., Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 550 (1991) ("Where a represented party appends its signature to a document that a reasonable inquiry into the facts would have revealed to be without merit, we see no reason why a district court should be powerless to sanction the party in addition to, or instead of, the attorney."); *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1205 n.7 (Fed. Cir. 2005) (citing *Bus. Guides, Inc.*, 498 U.S. at 550, for the proposition that a "party who signs a document in violation of Rule 11 may be sanctioned").

[5] The Federal Circuit in *Antonious* described the standard under Rule 11 of the Federal Rules of Civil Procedure, which is identical to RCFC 11. *See* 275 F.3d at 1071; Fed. R. Civ. P. 11.

In the show cause order, this Court ordered the government to address why monetary sanctions should not be imposed pursuant to RCFC 11 *and* the Court's inherent authority. *Oak Grove*, 2021 WL 3627111, at * 32. The government, in its response, entirely ignored the directive to address Rule 11 and addressed only the Court's inherent power to impose sanctions — which the government accurately describes as "narrowly circumscribed . . . when there [is] no fraud or bad faith." Def. Resp. at 4. The government thus contends that "sanctions are not warranted because the issues associated with the AR in this case were not the product of bad faith or fraud." *Id.* at 5. According to the government, "all of the issues associated with the [AR] in this case were not due to any intentional omissions by the undersigned counsel"[6] but instead "were caused by the conception by the supporting contracting personnel . . . as to what the full scope of the AR should include for this protest." Def. Resp. at 1. Put yet differently, the government maintains, "the [Agency] believed in good faith that it was complete, while simply failing to appreciate the potential relevance of the omitted documents to the issues in this protest." *Id.* at 3.

The government cannot escape sanctions by ignoring the applicable Rule 11 standard and pointing only to the heightened standard for imposing sanctions pursuant to a court's inherent powers. The Rule 11 standard for imposing sanctions does not require a finding of bad faith and does not excuse a violation based on a showing of subjective good faith. *See, e.g., Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013) (explaining that Rule 11 "allows the imposition of punitive sanctions," "does not involve inquiry into a party's subjective good faith," and "does not require a showing of bad faith"). Instead, "Rule 11 functions to assure that parties assert litigation positions that are *objectively reasonable* at the time of filing." *Id.* (emphasis added). Supreme Court precedent also precludes a "good faith"-type defense to Rule 11 sanctions. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) ("Rule 11 . . . imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith."). This objective standard is "intended to eliminate any 'empty-head pure-heart' justification[s] . . . ." Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment).[7]

Applying the correct Rule 11 standard to the facts here, the Court holds that the Agency's "fail[ure]" to appreciate the potential relevance of the omitted documents to

---

[6] Again, the Court accepts without hesitation that the government's counsel of record "was not aware of the two documents that are the subject of the show cause order." Def. Resp. at 3. Nevertheless, as discussed *infra*, that does not excuse the Agency's failures here.

[7] "[W]hat constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion or other paper; whether the pleading, motion or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar." Fed. R. Civ. P. 11 Advisory Committee Notes (1983 Amendment).

the issues in this protest" was neither reasonable nor excusable.  Def. Resp. at 3.
Moreover, the Court holds that the failure to include the documents at issue in the
originally filed administrative record:  (1) contributed to substantial delays in the
resolution of this case; (2) wasted the Court's time in attempting to engage in fact
finding on an incomplete record; and (3) had the effect of imposing costs on Oak Grove
due to, at a minimum, additional briefing, status conferences, and hearings.  In short,
the Agency's withholding of the documents at issue from the initial filing of the
administrative record harmed Oak Grove and the judicial process.

## III.   ADMINISTRATIVE RECORD REQUIREMENTS

Before turning to the specific documents covered by the show cause order (and
the related issues on which the Court required briefing), the Court writes to amplify its
previous rejection of the government's general premise, articulated repeatedly in this
case — that an agency is entitled to subjectively decide what it believes is relevant to a
plaintiff's claims for the purposes of compiling the administrative record.  *See* ECF No.
47 at 2 (explaining that the government did not include certain documents in the record
because it considered them not "*especially* relevant or necessary to the instant protest"
(emphasis added)); *Oak Grove*, 2021 WL 3627111, at *10–*12 (discussing RCFC App. C,
rejecting the government's interpretation of it, and holding that "in compiling the
administrative record, the government does not possess a unilateral veto over
administrative record documents based on a self-serving conclusion that they are not
relevant to the procurement decision under review").

### A.  The Administrative Record Must Include Documents Related to the
### Challenged Procurement Decision

The Court begins with what it believes is common ground:  "in a bid protest, the
administrative record need not consist of every single document related in any way to
the procurement in question, but may be reasonably limited to materials relevant to the
specific decisions being challenged."  *Tauri Grp., LLC v. United States*, 99 Fed. Cl. 475,
481 (2011).  That is where the common ground ends, however, as the Court rejects the
government's cramped view of the operational meaning of "relevant" in an action
pursuant to 28 U.S.C. § 1491(b).

The Court holds that while government agencies need not include in an
administrative record "every single document related in any way to the procurement"
at issue, *Tauri Grp.*, 99 Fed. Cl. at 481, agencies must include in the record all documents
related to their ultimate procurement decision.  This standard is not new, and has been
long articulated in both case law and by government agencies themselves.  The U.S.
Department of Justice, for example, recognizes that "[t]he administrative record is the
paper trail that documents the agency's decision-making process and the basis for the
agency's decision."  U.S. Dep't of Justice, Env't and Nat. Res. Div., Guidance to Federal

Agencies on Compiling the Administrative Record 1 (Jan. 1999) (providing "guidance to agencies in compiling the administrative record of agency decisions other than a formal rulemaking or an administrative adjudication").[8]

Accordingly, "[t]he administrative record consists of all documents and materials directly *or indirectly* considered by the agency decision maker in making the challenged decision." *Id.* at 1–2.  A proper administrative record "is not limited to documents relevant only to the merits of the agency's decision" but also "includes documents and materials relevant *to the process* of making the agency's decision."  *Id.* at 2 (emphasis added).  The Justice Department guidance even alludes to the sort of problems the Court has been forced to address herein.  *See id.* at 1, 7 (warning that "[i]t is critical for the agency to take great care in compiling a complete administrative record" because "[i]t is worth the effort and may avoid unnecessary and/or *unfortunate litigation issues later on*" (emphasis added)).

Critically, the Justice Department advises agencies to include in the record "documents and materials" (1) whether they "support or do not support the final agency decision," (2) that either "were before *or available to* the decision-making office at the time the decision was made," and (3) that "were before the agency at the time of the challenged decision, *even if they were not specifically considered by the final agency decision-*maker." *Id.* at 2 (emphasis added).[9]

Although that Justice Department guidance document is non-binding and "does not create any rights," *id.* at 7, courts have routinely relied upon it in explaining what materials must be included in an administrative record.  *See, e.g.*, *Sierra Club v. Zinke*, 2018 WL 3126401, at *3 (N.D. Cal. June 26, 2018) (explaining that "[t]he Department of Justice Guidance on compiling administrative records, promulgated in 1999, endorses producing materials that [plaintiffs] seek" and noting that "[t]his district has repeatedly required deliberative materials (such as internal comments, draft reports, emails, and meeting notes) to be added to the administrative record if they were considered in the agency's decision").[10]  In that case, the district court dispensed with the government's

---

[8] *See also* J. Goldfrank, Guidance to Client Agencies on Compiling the Administrative Record, 48 U.S. Att'ys' Bulletin 7 (Feb. 2000), https://www.justice.gov/sites/default/files/usao/legacy/2006/06/30/usab4801.pdf.

[9] *See also* U.S. Army Judge Advocate General's Legal Center & School, Dep't of the Army, Federal Litigation Deskbook 2016 G-39 (instructing that "[t]he agency should include all materials that might have influenced its decision, not just the documents upon which it relied" and that "[a]n agency may not exclude from the administrative record documents that reflect pertinent but unfavorable information" (citing cases)).

[10] *See also United Farm Workers v. Adm'r, U.S. EPA*, 2008 WL 3929140, at *2 (N.D. Cal. Aug. 26, 2008) (citing U.S. Dep't of Justice, Env't and Nat. Res. Div., Guidance to Federal Agencies on Compiling the Administrative Record (Jan. 1999) and ultimately holding that "the 'whole

argument that so-called agency "deliberative documents" do not belong in the record. *See Sierra Club*, 2018 WL 3126401, at *3 (describing the government claim that "agency deliberative documents are *not* properly considered part of the administrative record and therefore generally should not be produced as part of a record filed with the court, nor listed in a privilege log" (emphasis in original)).  The district court concluded that, with respect to such deliberative documents, "[t]he current Department of Justice position is contrary to the law in this Circuit."  2018 WL 3126401, at *3.

This Court need not address the deliberative documents question in this case because the government has never asserted that the Agency relied upon such an exception to withhold the documents at issue.  That said, the Court concurs with the United States District Court for the Southern District of Florida's view of relevancy, as applied to deliberative documents or any others:

> It is difficult to reconcile the notion that deliberative documents are irrelevant to judicial review []with the APA's command that review is to be based on the "whole record." The definition of "whole record" — material that was directly or indirectly considered by agency decisionmakers — should be the agency's north star.  Either a document was considered or it was not; *there is no obvious place for "relevance" under that standard.*

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 2020 WL 2732340, at *5 (S.D. Fla. May 26, 2020) (emphasis added).  The district court elaborated further on the issue of "relevance":

> [A]gency action is indeed judged based on the agency's stated rationale. . . . [But that] does not mean that courts have no role in ensuring at the outset that they have been presented with the whole record. . . . [I]t is also true that deliberative documents are prone to reveal the mental processes of decisionmakers — in fact, that is a requirement to claim the

_____

record' subject to review under the [Administrative Procedure Act ("APA")] is not merely the record designated and submitted by the agency" (quoting *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1989))); *see also In re United States*, 875 F.3d 1200, 1208 (9th Cir. 2017) (relying upon the Justice Department guidance document), *vacated on other grounds by In re United States*, -- U.S. --, 138 S. Ct. 443, 445 (2017).  In *In re United States*, the Supreme Court remanded the case, requiring the lower courts to resolve "threshold arguments" before addressing the administrative record; it left to the district court the discretion to compel document disclosures after giving the government an opportunity to argue the issue.  138 S. Ct. at 445.

> privilege, and such privileged documents should be excluded
> from the record. . . . But that's not a matter of *relevance*; to the
> extent a deliberative document discloses the factors that were
> or were not considered by the agency, it may "go to the heart"
> of whether a decision was arbitrary and capricious.

*Id.* (internal citations omitted) (emphasis in original); *see also id.* at *8 (holding "that deliberative documents may be withheld from the record only upon invocation of the deliberative process privilege, as documented in a privilege log").  By way of analogy, in the discovery context, "[i]t is not for a party to determine, by a unilateral review of documentation, whether information is relevant to the case."  *Sanchez v. U.S. Airways, Inc.*, 202 F.R.D. 131, 135 (E.D. Pa. 2001).[11]

      In sum, the government's view of relevancy in this case would undermine the requirement that the Court consider the "whole record."  5 U.S.C. § 706; s*ee also* L. Beck, *Agency Practices and Judicial Review of Administrative Records in Informal Rulemaking*, Report for the Admin. Conf. of the U.S., at 31 (May 14, 2013) ("ACUS Report") (explaining that "using a 'relevancy' standard . . . raises the question of whether application of such an intervening test would narrow the administrative record beyond the 'whole record' required for judicial review" and advising that "[a]gency guidance should avoid introducing subjective judgments regarding whether materials have been 'relied' upon or are 'relevant'").[12]

## B. Federal Circuit Precedent Does Not Preclude Discovery Regarding How an Agency Compiled, or What It Omitted from, the Administrative Record

      In *Axiom Resource Management*, the Federal Circuit cautioned against "adding . . . documents to the record without evaluating whether the record before the agency was sufficient to permit meaningful judicial review." 564 F.3d 1374, 1380 (Fed. Cir. 2009).  That decision, however, provides no guidance on when documents that

---

[11]*See also Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd.*, 327 F.R.D. 52, 54 (S.D.N.Y. 2018) ("The weight of authority in this Circuit goes against allowing a party to redact information from admittedly responsive and relevant documents 'based on that party's unilateral determinations of relevancy.'" (quoting *Cyris Jewels v. Casner*, 2016 WL 2962203, at *4 (E.D.N.Y. May 20, 2016))); *Polk v. Swift*, -- F.R.D. --, 2021 WL 2941994, at *2 (D. Wyo. Jan. 22, 2021) (noting that even "[a]fter the 2015 amendments to Rule 26, . . . "[r]elevance is to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to the other matter that could bear on any party's claim or defense.'" (quoting *State Farm Mut. Auto. Ins. Co. v. Fayda*, 2015 WL 7871037 at *2 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016))).

[12] *Available at* https://www.acus.gov/publication/agency-practices-and-judicial-review-administrative-records-informal-rulemaking-report.

indisputably *were* before an agency properly may be *excluded* from the compiled administrative record.  In that regard, while the government, in the undersigned's experience, typically (and correctly) has resisted the characterization of the administrative record as a "fiction," *see Naval Systems, Inc. v. United States,* 153 Fed. Cl. 166, 177–78 (2021) (discussing the compilation and contents of the administrative record), that is because that label suggests that the record is a fluid concept without boundaries; if the record is a mere "fiction," the record may include whatever the parties want this Court to consider.  Neither the government nor this Court has any interest in returning to such a pre-*Axiom* world — and that would be improper post-*Axiom*, in any event.  But the "necessary corollary" of the administrative record not being some fiction to which the parties may add whatever they please is that neither this Court nor plaintiffs should "have to police the government's filing as if routine discovery rules apply."  *Oak Grove*, 2021 WL 3627111, at *12 (noting that "to a great extent, a plaintiff in a § 1491(b) action is at the mercy of the government to file a complete, certified record").

Moreover, if the government is going to err on the side of excluding material from an agency record based on its own *sub-silentio* relevancy determinations, not only does that likely violate this Court's rules,[13] but also such a strategy will invite discovery battles surrounding the compilation of the administrative record that neither the government nor this Court wish to encourage.

Parties — and particularly the government — should keep in mind that *Axiom* was concerned with this Court's not crossing the line from a proper APA review of agency action into *de novo* review by testing an agency's decision against evidence that was not before the agency.  *Axiom*, 564 F.3d at 1380–82.  Nothing in *Axiom*, however, would preclude this Court from following the guidance in *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997), that "[i]n order to preserve a meaningful judicial review, the parties must be able to suggest the need for . . . possibly limited discovery, aimed at determining, for example, *whether other materials were considered* . . . ."  37 Fed. Cl. at 350 (emphasis added); *see also Naval Systems*, 153 Fed. Cl. at 182 (describing a "type of circumstance[] in which extra-record evidence should be considered" as including a protest arising "from the very omission of evidence upon which the Agency relie[d]").  To be clear, the Court is not talking about discovery to add materials to the record; that is something that *Axiom* generally precludes.  But *Axiom* does not preclude discovery regarding *how* an agency compiled the administrative record or *what* was omitted from it.  *Naval Systems*, 153 Fed. Cl. at 179 ("Nor has our Court clearly defined

---

[13] *See Oak Grove*, 2021 WL 3627111 at *12 n.13 (explaining that "there is a distinction between the GAO's record production requirements and the Court's Rules governing the filing of the administrative record").

supplementation as the addition of evidence that the agency considered but omitted from the record.").[14]

Accordingly, and even considering the presumptions of good faith and regularity (as applied to the compilation of the administrative record), if the record was limited to only what the agency designated, "[e]ven material that was heavily considered by decision-makers would amount to 'extra-record' evidence if the agency failed to designate it." *Ctr. for Biological Diversity*, 2020 WL 2732340, at *3; *see also id.* at *6 (holding that "even accounting for the presumption of regularity," permitting too "large [of a] measure of discretion in determining the content of the administrative record . . . risks frustrating effective judicial review"). The government should think hard about whether relying upon such circular logic and dubious relevancy determinations will benefit it in the long run.

In any event, as discussed below, the Court holds that the Agency's failure to include the documents at issue in the initially filed administrative record was improper under not only the above-discussed Justice Department guidance — which, although non-binding, the Court views as accurately describing an agency's duty — but also under any definition of relevance.

## IV.   THE AGENCY UNREASONABLY OMITTED THE DOCUMENTS AT ISSUE FROM THE INITIAL ADMINISTRATIVE RECORD FILING

The Court notes, once again, that the factual findings surrounding the various debacles with the administrative record are detailed in the Court's merits decision. *Oak Grove*, 2021 WL 3627111, at *9–*13, *28–*30. Accordingly, the Court endeavors to repeat facts, whether substantive or procedural, only to the extent necessary for context and clarity.

### A.  The DCMA Report

The government contends that "the omission of the DCMA pre-award report did not come to *our* attention until oral argument in this case." Def. Resp. at 6 (emphasis added). The government does not make clear what it intends by the plural possessive

---

[14] *Axiom* does not conflict with this Court's earlier observation that an agency's compilation of the administrative record is subject to the Court's review: "Effective judicial review of an agency's exercise of discretion is irreconcilably at odds with the notion that the reviewing court's inquiry must be confined to an administrative record that is likewise the product of the agency's sole discretion." *Pikes Peak Fam. Hous., LLC v. United States*, 40 Fed. Cl. 673, 676–77 (1998); *see also* ACUS Report at 66, 69 (noting that "the agency does not unilaterally determine what constitutes the administrative record" and warning that "the risk of incompleteness may rise with delayed compilation of an administrative record").

"our" but to the extent it is meant to refer to the Department of Justice, the Court fully credits the assertion. *Id.* at 3 (representing that "the undersigned counsel was not aware of the two documents that are the subject of the show cause order" at the time the administrative record was filed). On the other hand, to the extent that the government asserts that *Agency* personnel, including the contracting officer, were not aware of the DCMA report, the Court rejects that contention. As the government itself noted, the Agency included the DCMA report at issue in the administrative record of a related GAO protest. Def. Reply at 8–9 n.5. The Agency's personnel clearly were aware of the DCMA report.

Thus, the only question the Court need decide is whether the contracting officer, acting on behalf of the Agency, reasonably concluded that the DCMA report was *not* properly part of the administrative record in this case. On *that* precise question, the government offered little to no explanation in its initial response to the Court's show cause order. Def. Resp. at 6–7. Indeed, the government forthrightly expressed its "regret that we (along with the Court and the parties) were not made aware of this document" — presumably by the Agency — "until late in the proceedings." *Id.* at 7. The Court appreciates the government's candor and remorse, but that apology hardly excuses the fact that *the Agency* failed to include the DCMA report in the record until after both the completion of the merits briefing and oral argument.

The government in its reply brief asserts that "under the totality of these circumstances, with zero evidence of fraud or bad faith, penalizing the Government with *sanction[s]* amounts to a zero tolerance standard that is wholly inappropriate[.]" Def. Reply at 10 (emphasis in original). As the Court made clear, *supra*, however, Rule 11 does not require that this Court make a finding of fraud or bad faith to impose sanctions. To be clear, the Court does not suggest that mere accident or oversight are proper predicates for sanctions. Accordingly, the Court is not a proponent of, nor is the Court applying, a "zero tolerance standard." Rather, in this case, the government concedes that the Agency made a deliberate decision *not* to include the documents at issue, Tr. 13:3–22, and did not consult Justice Department counsel about that decision, Tr. at 11:12–15. The Court concludes that, in light of the facts and issues at the heart of this case, the Agency acted in an objectively unreasonable manner that is consistent with, at a minimum, an attempt to shape the record in its favor.

The government troublingly proffers almost no explanation for *why* the Agency affirmatively declined to include the DCMA report in the initial AR in this case. The government asserts that both documents at issue "were not originally in the AR because they were not considered relevant to the instant protest as they pertained to the 'first' evaluation of proposals (before the GAO protest and corrective action), not the second evaluation currently being challenged." Def. Resp. at 3 (citing ECF No. 47). According to the government, the Agency "simply fail[ed] to appreciate the potential relevance of the omitted documents to the issues in this protest." *Id.* The Court rejects that

explanation as objectively unreasonable.  This rejection is not simply the Court's Monday-morning quarterbacking.

As explained in the Court's merits decision, a central issue in this case was whether Oak Grove even had standing to pursue its protest as an "interested party" pursuant to 28 U.S.C. § 1491(b).  *Oak Grove*, 2021 WL 3627111, at *7–8; Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 27, at 14–18.  In a nutshell, the government's consistent position — throughout the prior GAO litigation and before this Court — has been that Oak Grove lacked standing due to the existence of a so-called intervening offeror.  Pl. Resp. at 6 (quoting the GAO record).  The government's argument was that Oak Grove lacked standing because even if it could demonstrate that the Agency's contract award to Defendant-Intervenor was erroneous, Oak Grove still would not have had a substantial chance of receiving the contract award, as Offeror H *was* determined to be eligible for award, while Oak Grove was not.  Thus, for Oak Grove to have standing, and to succeed on the merits, Oak Grove had to allege and then prove that both Defendant-Intervenor and Offeror H were ineligible for award.  Pl. Resp. at 6.

Accordingly, the DCMA report was objectively and clearly material to the government's standing argument.  As the Court previously explained, the DCMA report reflects a recommendation of "No Award" for Offeror H.  *Oak Grove*, 2021 WL 3627111, at *18 (citing AR 4994).  The RFP required the Agency, at a minimum, to consider that recommendation, if not follow it, but "[n]owhere does the record demonstrate that the Agency even considered this DCMA finding (assuming for the sake of argument that the contracting officer were permitted to depart from it)."  *Oak Grove*, 2021 WL 3627111, at *18 (citing AR 1714 (RFP § M.4.3.7) and explaining that "[t]his document clearly demonstrates that [Offeror H] was found to be not financial[ly] capable and thus was not awardable consistent with the RFP's requirements").  Because the RFP required that the "Prime offeror *must* be deemed financially responsible by the Contracting Officer *based on* the Financial Capability Risk Assessment[,]" the notion that the DCMA report was immaterial to the government's standing argument is facially inconsistent not only with the findings in the document itself but also the obvious purpose for which the DCMA prepared it.  AR 1714 (§ M.4.3.7) (emphasis added).

During oral argument on the show cause order, the government argued that the DCMA report was not relevant to the dispute because "the audit report is not a ground for finding [Offeror H] ineligible."  Tr. 16:21–22.  But that is nothing more than an argument on the merits, supporting the government's position on the standing question.  The government cannot be permitted to make a self-serving merits determination to avoid producing certain (damaging) documents as part of the administrative record in the first place.

Moreover, Oak Grove persuasively argues that the Agency went to some length to conceal what the administrative record revealed about Offeror H. For example, in the record submitted to the GAO, the Agency extensively redacted documents related to criticisms of Offeror H, including a notable redaction obscuring that it was "found [by DCMA] to be NOT financially capable of performing the contract." Pl. Resp. at 7 (depicting redacted evaluation document); *id.* at 8 (noting that Oak Grove "objected to these redactions" at the GAO). The Court agrees with Oak Grove that "[t]he Agency's arguments ignore that the Agency reviewed the DCMA report, believed it important enough to document in its [Prenegotiation Objective Memorandum / Price Negotiation Memorandum], but then chose to redact that information at GAO and to withhold the DCMA report from both GAO and this Court." Pl. Resp. at 8. While the Court cannot police the Agency's past conduct regarding the record before the GAO, there is no reason the Court cannot consider such conduct in determining whether the Agency had a reasonable basis to keep the DCMA report from Oak Grove and the Court in this proceeding.[15]

Finally, the government argues that its AR production was extensive, but that fact supports, rather than undermines, Oak Grove's position. For example, the government observes that "[t]he AR that we filed in this case . . . included the full record of the GAO proceedings pertaining to Oak Grove *as well as additional documents that were not included in the GAO record pertaining to Offeror H*." Def. Resp. at 2 (emphasis added). That assertion merely begs the question why, then, did the Agency deliberately omit the DCMA report, which also pertained to Offeror H? The government never suggested that the Agency's omission was simply inadvertent. And again, the Court cannot conclude that the Agency had a reasonable basis to omit the DCMA report from the record, particularly given the government's admission that the Agency included documents related to Offeror H in the initial administrative record filing with the Court. While the government now avers that it included such documents "because Oak Grove specifically challenged [Offeror H's] cost proposal . . . [s]o documents were introduced with respect to that," Tr. 21:8–14, the problem is that RFP § M.4.3.7 (AR 1714) is located within the RFP's evaluation factors covering the "Cost/Price Evaluation" (§ M.4.3). AR 1713.[16] And § M.4.3.7 specifically required the consideration of the Financial Capability

---

[15] Redactions here would have been entirely inappropriate; *a fortiori*, withholding entire documents is no better. *See Doe v. Trump*, 329 F.R.D. 262, 276 (W.D. Wash. 2018) ("[T]he court concludes that 'the better . . . approach is to not provide litigants with the *carte blanche* right to willy-nilly redact information from otherwise responsive documents in the absence of privilege, merely because the producing party concludes on its own that some words, phrases, or paragraphs are somehow not relevant.'" (quoting *Bonnell v. Carnival Corp.*, 2014 WL 10979823, at *4 (S.D. Fla., Jan. 31, 2014))).

[16] A solicitation's evaluation factors are generally contained within an RFP's Section M. *See* AR 1709 (RFP § M.4 ("Factors"), RFP § M.4.1 ("Factor 1 – Capability Evaluation Approach")); AR

Risk Assessment DCMA prepared.  The Agency cannot explain why that report is any less relevant to the § M.4.3 evaluation than all of the other cost proposal materials the Agency *did* include in its initial record filing.  The most reasonable explanation, if not the only reasonable explanation, is that the Agency selectively omitted a document that was harmful to its position.

In sum, as Oak Grove argues, the Agency's failure to include the DCMA report "forced extensive added effort by this Court and the parties."  Pl. Resp. at 10.

### B.  The RM Termination Letter

On June 1, 2021, the government included the RM termination letter as part of a corrected AR filing, *see* ECF No. 55, made pursuant to the following court order:

> [C]ounsel of record for the government shall consult with the cognizant contracting officer to determine *whether any other documents relating to the agency's decision-making at issue* (e.g., the contract awardee's proposal, Offeror H's proposal, and/or [RM's] role in the procurement at any stage) were omitted from the administrative record. Counsel of record ***shall complete the administrative record*** and certify compliance with this order in a status report, on or before Friday, June 4, 2021, at 12:00 p.m.

ECF No. 53 (May 28, 2021, Order) (emphasis added).  Thereafter, the government certified as follows:

> Pursuant to the Court's order of May 28, 2021, defendant, the United States, respectfully submits the following status report. This is to certify that, we have consulted with agency contracting officer in obtaining documents that were omitted from the administrative record, ***we have complied with the Court's order in correcting and completing the administrative record***.

ECF No. 60 (June 4, 2021, Status Report) (emphasis added).  To be clear, then, the Court did not order the government to produce the termination letter specifically.  Rather, the government apparently determined, when ordered to do so, that the document was necessary to complete the administrative record because it related "to the agency's decision-making at issue."  In including the RM termination letter, the government thus

---

1712 (RFP § M.4.2 ("Factor 2: Past Performance Evaluation Approach")); AR 1713 (RFP § M.4.3 ("Factor 3 – Cost/Price Evaluation Approach")).

implicitly agreed that the letter was necessary to complete and correct the administrative record.[17]

Equally important is what the government did not do.  The government did not seek, for example, *in camera* review of the RM termination letter to establish that it was irrelevant either "to the agency's decision-making at issue" or otherwise to this case, generally.[18]  Indeed, even now, the government does not assert that the Agency made the correct call with respect to the RM termination letter, but rather admits that had the government's counsel of record "been aware of the April 30, 2020 termination letter, [he] would have included it in the AR."  Def. Resp. at 5.  In other words, with respect to the RM termination letter (as with the DCMA report), the only question for the Court is whether the government's proffered excuse for the Agency — that it "simply fail[ed] to appreciate the potential relevance of the omitted document[] to the issues in this protest," Def. Resp. at 3 — is objectively reasonable.  Based on the foregoing analysis alone, the Court answers that question in the negative.  Nevertheless, the Court will address the government's additional arguments.

Notwithstanding that the Agency produced the RM termination letter without being specifically ordered to do so, the government asserts, *post hoc*, that the document was irrelevant to this case based on a version of a harmless error argument.  According to the government, the Agency "unintentionally and inadvertently omitted a document *that is helpful to the Government* in countering the protestor's allegation that [RM]" — the initial SSEB Chairperson — "may have improperly steered award to F3EA."  Def. Resp. at 5–6 (emphasis added).  That is true, the government posits, because "[a]lthough the termination letter is critical of [RM] in his role as SSEB chair . . . the letter also demonstrates that [RM] had no role in the second source evaluation determination at issue in this protest."  *Id.* at 5.  The assertion that the RM termination letter "is helpful to

---

[17] As the Court previously noted, the RM termination was added to the AR "*without any explanation for its original omission . . . .*"  *Oak Grove*, 2021 WL 3627111, at *10.

[18] *Cf. MVS USA, Inc. v. United States*, 111 Fed. Cl. 639, 643 n.4 (2013) (noting that the "government provided the MOA after completion of briefing, ostensibly to address questions that had arisen in the briefing on the dispositive motions," but overruling "the government's objections to its inclusion" in the administrative record); *Inst. for Fisheries Res. v. Burwell*, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017) ("It is obvious that in many cases internal comments, draft reports, inter– or intra-agency emails, revisions, memoranda, or meeting notes will inform an agency's final decision. Therefore, the government is wrong to assert that these types of materials, as a categorical matter, should be excluded from the universe of materials 'directly or indirectly considered by agency decision-makers.'  Of course, these types of materials could be protected from disclosure by the deliberative process privilege.  But the scope of the privilege doesn't define the scope of the material directly or indirectly considered. If a privilege applies, the proper strategy isn't pretending the protected material wasn't considered, but withholding or redacting the protected material and then logging the privilege." (citations omitted)).

the government" is "the kind of argument that only a lawyer could love," *Est. of Rao v. United States*, 987 F. Supp. 249, 253 (S.D.N.Y. 1997), and is demonstrably wrong.

*First*, before the government proffered this explanation, the Court already had found that "[t]he Agency issued this [termination] letter . . . *during corrective action*, before the Agency's second award decision." *Oak Grove*, 2021 WL 3627111, at *11 n.10 (citing AR 5388) (emphasis added). The government makes no attempt to address that factual finding with any specificity. Moreover, during the hearing on the show cause order, the government agreed with the Court's understanding of the RM termination letter:

> **The Court:** You can tell me that this is not accurate, but a sane, rational[-]person['s] reading [of] this is that there was corrective action, the corrective action was to review and amend the [proposal evaluation report ("PER")], there were multiple versions of that PER that were produced, there were still problems between the subsequent versions of the PER having disagreements between the documented findings and the requirements, and then, *since those persisted*, [RM] was replaced.
>
> Am I not reading that right?
>
> **[Government]:** No, that's what it says.

Tr. 30:1–11 (emphasis added). When the Court pressed the government regarding precisely when the Agency removed RM as SSEB Chairperson during the corrective action process, the government repeatedly admitted that it did not know. *Id.* at 30:15–20; 31:1–2 ("I don't know those details."). The Court remains uncertain how, in light of that exchange, the government could make the assertion that the RM termination somehow definitively "demonstrates that [RM] had no role in the second source evaluation determination." Def. Resp. at 5.

*Second*, during the show cause hearing, the Court asked the same question to a government witness, Mr. [DW], who replaced RM as SSEB Chairperson. *See* Tr. 31:19–21; AR 5390. Mr. [DW] responded that his involvement with the procurement began in February 2020 when "corrective actions *were ongoing*" and he was asked to "review . . . the actions . . . taken so far and provide . . . an assessment" to his supervisor. Tr. 31:24–32:6 (emphasis added). As a result of Mr. [DW]'s analysis, "the recommendation to [the CO] was that [RM] be removed" and, thus, Mr. [DW] "was

inserted into the source selection as the source selection chair."[19]  Tr. 32:11–14.  Thus, there is no doubt that RM played a role in the corrective action from the conclusion of the GAO protest in January 2020, through at least part of the corrective action period, until his removal as SSEB Chairperson at the end of April 2020.  Mr. [DW] informed the Court that RM only "made some initial drafts" that Mr. [DW] reviewed and that "never went forward" to be "acted on," *see* Tr. 32:19–25, but that is a far cry from definitively substantiating that RM — or, more critically, his work — played no role in the ultimate source selection decision at issue in this case.

Mr. [DW]'s representations to the Court provide, if anything, good reason for Oak Grove (and the Court) to have concerns about how RM's prior work may have impacted the second source selection at issue here:

> **THE COURT:**  Let me understand what you did not do.  You did not take the initial evaluations, put them to the side, throw them in the trash can, and start the evaluation over from scratch of the proposals.

> **MR. [DW]:**  We did not take all of them and set them aside and start again because, as I said, I could not do anything with[out] the two subject matter experts whose input was actually very critical in understanding the merits of the exercises that were part of Sections L and M.

Tr. 34:4–13.  (Those subject matter experts who performed the initial proposal evaluations apparently were unavailable during corrective action.)

The Court remains perplexed by the government's unequivocal assertion that "[RM] played no role in the second evaluation . . . ."  Def. Reply at 7.  While he may have played no role in the final "August 2020 . . . award" decision or the final decision document itself, *id.*, that plainly does not mean that he had no influence on the work product Mr. [DW] and other Agency personnel considered or relied upon.  In any case, Oak Grove was entitled to develop arguments on those subjects, but was deprived of the opportunity to do so.

Accordingly, the Court rejects the government's assertion that because "[RM] played no role in the second evaluation, the termination letter was not germane to the evaluation decision."  Def. Reply at 7.  RM's role and influence in this procurement was a central factual issue in Oak Grove's claims.  The government's attempt to minimize his role in the procurement and the corrective action — based on the very termination

---

[19] Mr. [DW] likely misspoke as the record indicates he was appointed SSEB Chairperson on May 4, 2020 ("source selection chair" is not referenced).  AR 5390.

letter which lends support to Oak Grove's central thesis — is rejected (and, in any event, is a *post hoc* rationale for why it was excluded from the record).  In sum, the Court agrees with Oak Grove that "[c]ontrary to the [termination] Memorandum, the Agency sought to present a picture of objective, impartial involvement by [RM]" and that the termination letter "contradicts" — or, at the very least, arguably undermines — "the Agency's position" throughout this litigation.  Pl. Resp. at 9 (noting that the AR did not otherwise "reveal[] internal concerns about [RM's] actions").[20]

\* \* \* \*

All of this discussion leads the Court to address yet two additional arguments the government makes:  (1) that "neither the [Agency] nor the Department of Justice concealed the fact of the prior role of [RM] as SSEB chair in the Raptor IV procurement" (*see* Def. Resp. at 5); and (2) that the government did not mischaracterize the Agency's corrective action (*see* Def. Reply at 2–7).  The Court addresses each issue, in turn, below.

## V.     THE ADMINISTRATIVE RECORD, AS INITIALLY FILED, OBSCURED RM'S ROLE IN THE PROCUREMENT

With regard to RM's role in the procurement, the government notes that "[t]wo documents originally included in the GAO record, and included in the original AR that we filed in this Court on February 10, 2021, identified [RM] as the SSEB chair."  Def. Resp. at 5 (citing AR 1582, 1631).  The first reference is to a signature block on the second page of the Source Selection Plan (AR 1582); the second is to an organization chart depicting the "Source Selection Team Structure" (AR 1631).  While the government argues that Oak Grove, therefore, was on notice of RM's true role and presumably could have sought additional documents earlier in the case, neither Oak Grove nor the Court can be expected to have located those two needles in a "4,862 page[]" haystack.  Def. Resp. at 2.[21]

---

[20] To be clear, the Court reaches no conclusion on the substance of RM's conduct.  Again, the Court's point is simply that APA review requires the agency to file "the whole record" and that Oak Grove was deprived of the opportunity to make arguments based upon the missing document.  5 U.S.C. § 706 ("the court shall review the whole record").

[21] The Court does not hold that a plaintiff-protester is never responsible for finding such needles in a voluminous administrative record.  Nor does the Court attempt here to define in all circumstances when a plaintiff has sufficient notice of the existence (or likely existence) of documents such that the plaintiff must raise the issue in a timely manner with the government or the Court.  Instead, as explained in this section of this order, the Court finds only that under the facts of this case — including, but not limited to, the virtually camouflaged location of the information at issue — neither the Court nor Oak Grove were on notice of RM's true role in the procurement at issue.

The existence of those documents does not demonstrate the government's good faith — even if good faith were the relevant standard for Rule 11 — particularly because the government, throughout its merits briefing, repeatedly and *exclusively* referred to RM as the contracting officer's representative or "COR."  *See, e.g.*, ECF No. 30 at 59 ("COR [RM] allegedly discussed efforts to steer the procurement towards the awardee, F3EA"), 61 (arguing that "as a Government official, [RM], the COR, is presumed to act lawfully"), 64–65 (quoting statement of "COR [RM]"), 70 (referring to "a COR, such as [RM]").  In one such reference, the government responds to an Oak Grove argument, noting as follows:

> Oak Grove cites to that portion of the OCI investigation report where the contracting officer summarized the statement of COR [RM], where [RM] stated, in effect, that, in creating the RAPTOR IV sample STOs, the [Agency] made significant changes to the RAPTOR III performance work statements "to mitigate the incumbent advantage."

ECF No. 30 at 69 (quoting AR 2044).

To the extent the government was discussing RM's role on the predecessor contract, it understandably refers to RM as the "COR."  On the other hand, the above quote describes RM's knowledge of RAPTOR IV — the procurement at issue — in which he served as the SSEB Chairperson, not the COR.  Similarly, in arguing that "[t]he contracting officer, in his discretion, unequivocally determined that [an] OCI did not exist in the RAPTOR IV procurement," the government asserted that such discretion "does not rest with a COR, such as [RM]."  *Id.* at 70.  This statement is misleading on its face (even if unintentionally so) because RM was not the COR, but rather the SSEB Chairperson, on RAPTOR IV.

The government's response brief (on the merits) repeats the same pattern and suffers from the same problem; it never once identifies RM as the SSEB Chairperson. For example, there is this statement:

> [T]he contracting officer *did* investigate the allegations by interviewing the contracting officer's representative (COR) [RM] and at least six other Government and contractor witnesses and reviewed written statements and documents: [RM] and the other witnesses *flatly denied* the allegations of wrongdoing lodged against COR [RM] by Oak Grove.

ECF No. 38 at 30 (emphasis in original).  Of course, at that point, RM was the SSEB Chairperson on RAPTOR IV, and not just the COR on the predecessor contract.

More significantly still — as highlighted in the Court's merits decision — as late as oral argument on the merits, neither the Justice Department nor Agency counsel themselves knew what role RM had played in the procurement at issue.  *Oak Grove*, 2021 WL 3627111, at *28 (citing ECF No. 45 ("May 24, 2021 Tr.") at 122:15–22).  To make matters worse, "[t]he government emphasized — erroneously, as it turns out — that regardless of whatever role [RM] may have played in the evaluations, 'there was a separate source selection evaluation board.'"  2021 WL 3627111, at *28 (quoting May 24, 2021 Tr. at 122:25 – 123:1).  That statement was flat wrong given that RM managed the SSEB.  And, even once RM had been replaced, there was no "separate" SSEB; the first SSEB's work was not redone (a difficulty the Court addresses below).

In sum, the assertion that the Court or Oak Grove *should have* discovered RM's true role in the RAPTOR IV procurement — based on just two bare references in the administrative record — when neither the Justice Department nor Agency counsel could tell the Court what role RM played in the procurement rings particularly hollow, as does the government's assertion that RM's role was "never raised."  Tr. at 77:21–22.  The government cannot claim ignorance of something so central to the case while simultaneously asserting that the plaintiff should have known it; to permit such a claim would be to allow the government to use the proverbial needle in a haystack as both a sword and shield.

The fact is that RM's role in this procurement was at the center of Oak Grove's case.  Accordingly, the Court wholeheartedly agrees with Oak Grove's argument:

> Rather than saying, you know what, we had relevant documents that were missed, we failed to produce them, we're sorry, we've now been through multiple rounds of [the government] trying to justify something that is clearly indefensible. . . .
>
> [T]he fact that [RM] had something to do with this procurement has been a centerpiece of our protest from the get-go.  We've been saying since the get-go that there's an impropriety here with him. . . .
>
> And what [the government] did . . . whether . . . his role [is reflected] in some signature block . . . [or] some [reference] buried somewhere [—] [the government] withheld a document by which they removed him as the SSEB chair from this procurement, and that removal is not reflected[.]  [I]t's not reflected in their source selection decision document; it's not reflected in their Source Selection Advisory Committee memorandum; it's not reflected anywhere.  And it wasn't

produced to the Court until — this Court, because of its diligence, discovered that.

And to put that on anybody but the party who's responsible for certifying this record is really blaming others for not finding needles in haystacks to question whether or not the United States properly put its record together. The United States' obligation is to put the record together.

Tr. at 81:16 – 82:17; *see Oak Grove*, 2021 WL 3627111, at *12 (holding that "plaintiffs must be entitled to rely upon the government's certification that the filed administrative record is complete" and that "[p]laintiffs should not have to police the government's filing as if routine discovery rules apply[,]" and noting that "to a great extent, a plaintiff in a § 1491(b) action is at the mercy of the government to file a complete, certified record").

The bottom line in the Court's view is that there are all sorts of arguments Oak Grove may have raised (or questions the Court may have asked) had the record timely contained the RM termination memorandum. The Court will not rehash its merits decision here; suffice it to say, the Court rejects the government's assertion of harmless error or any similar argument.[22]

## VI.    THE AGENCY'S CORRECTIVE ACTION

The final issue from the show cause order briefing relates to how the government described the Agency's corrective action. This issue is important because the Court (and apparently Oak Grove) did not understand the nature of the corrective action — if it is even fair to describe it as such — until the RM termination letter was added to the administrative record. To explain the troubling nature of this issue, the Court compares:  (1) the government's representations to GAO about the promised corrective action; *with* (2) the administrative record's description of the nature of the corrective action the Agency implemented; *and with* (3) the description of the corrective action in the RM termination memorandum.

---

[22] *See Oak Grove*, 2021 WL 3627111, at *29 (noting that the "[termination] document – produced way too late in the day for this litigation – certainly casts a long shadow over [RM's] conduct in his role as SSEB Chair during this procurement, lends more than a modicum of support to the allegations of [misconduct by] F3EA's former employees, and was not addressed by either the PCO's investigation memoranda or counsel of record in this case").

As part of the show cause briefing schedule, the Court explained and ordered as follows:

> [T]he government in its motion for judgment on the administrative record ("MJAR") represented to the Court that following the initial GAO protest, "the SSEB convened to *evaluate proposals a second time*" and that "[t]he [Agency] received and *evaluated ten proposals*[.]"  ECF No. 30 at 8 (emphasis added); *see id.* ("Of the ten proposals *reevaluated . . . .*" (emphasis added)). The Court had expected the parties to address this issue in the further briefing the Court had ordered, but the Court recognizes that it should have made this expectation explicit — and does so now.
>
> Accordingly, the government shall address, in its reply brief, whether in the originally filed administrative record (*i.e.*, in the absence of the RM termination letter) there is evidence that the Agency's corrective action only consisted of "review[ing] and amend[ing] the PER" and not reevaluating the proposals, as the Agency had represented at GAO.  The government shall also address the above-quoted representations contained in its MJAR.

August 27, 2021 Order at 1–2.

The Agency "represented to GAO that, as part of corrective action, '[t]he [Agency] will *reevaluate* proposals consistent with the solicitation, determine the impact of the *reevaluations* on the source selection decision, and document its *reevaluation*[.]'" *Oak Grove*, 2021 WL 3627111, at *30 (quoting AR 348 (emphasis added)).  Consistent with that representation, the government asserted that "the SSEB convened to evaluate proposals a second time."  ECF No. 30 at 8.  The initial administrative record is considerably vaguer about precisely what the putative "corrective action" consisted of, but there is nothing in the record clearly inconsistent with what the Agency committed to the GAO or the government's subsequent description to the Court — at least, there *was* not, until the RM termination letter was added to the record.

The RM termination letter described the corrective action as rather minimal.  In particular, the RM termination letter reveals that "'[t]he corrective action was to add the omitted information into the PER, review the findings for compliance and determine if the ratings assessed were still relevant considering the additional information.'"  *Id.* at *29 (quoting AR 5388).  *That* description gave the Court considerable pause and left the Court with the distinct impression — late in these proceedings — that the Agency did *not* reconvene the SSEB "to evaluate proposals a second time" and thus did not perform a "reevaluation" as it represented.

The government responds that: (1) "the [Agency], did, in fact, 'evaluate proposals a second time'"; and (2) the administrative record already disclosed the true nature of the correction action, and thus the RM termination letter did not reveal anything new to the parties or the Court. Def. Reply at 2, 4. The Court rejects both arguments.

The government's support for its first contention is that "evaluators changed many of the substantive ratings and evaluative results . . . ." Def. Reply at 2. While the government repeatedly focuses on what "[t]he [Agency] changed" — and argues that those changes "led *us* to reasonably conclude that the [Agency] evaluated proposals a 'second time'" — that assertion does not help it. Def. Reply at 3–4 (emphasis added). As an initial matter, the word "us" strikes the Court as strange. Even if "us" is intended to refer to the Justice Department, surely the Agency itself knows whether proposals were evaluated a second time. Does the Justice Department mean to say that it was misled by the Agency?

The Court does not dwell on that semantic issue because, in any event, the Court's concern is not assuaged by the mere fact that there was a second award decision supported by a second evaluation document with different ratings than the first. Rather, the Court's concern is that the government represented that "the SSEB convened to evaluate proposals a second time" — the implication of "a second time" being *from scratch*.[23] In reality, however, the Agency simply assigned someone new to fix the award *documentation*, and only part of it, at that. *See, e.g.*, Tr. 33:11–19 ("Mr. [DW]: Cost price and past performance were not really picked up and readdressed. . . . Technical was where the biggest issues were and where I focused my attention. I was not able to bring all the players back together. There were two special operations representatives. *We were unable to bring them back to reevaluate*." (emphasis added)); Tr. 34:8–13 ("Mr. [DW]: We did not take all of [the initial evaluations] and set them aside and start again because, as I said, I could not do anything with[out] the two subject matter experts whose input was actually very critical in understanding the merits of the exercises that were part of Section L and M.").

In sum, what Mr. [DW] did as RM's replacement as SSEB Chairperson was "reassess[] whether or not the original findings were accurate." Tr. 34:20–21; *see also* Tr. 36:15–20 ("We reviewed all of the original findings. . . . [I]n the case of me being new, I added in what I had observed that was relevant to Factors L and M."). The fact that Mr.

---

[23] *See, e.g.*, *Orbis Sibro, Inc.*, B-418165.7, 2021 WL 1750369, at *3–4 (Comp. Gen. Apr. 12, 2021) (noting agency's explanation "that, *in order to ensure a proper and thorough evaluation*, the reevaluation did not rely on the previous evaluation but was performed anew" to include not only "a complete reevaluation of all proposals," but also "a new tradeoff analysis, and a new selection decision by a new source selection team" (emphasis added)).

[DW] performed some sort of "reconciliation," and "came up with a consensus" used to revise the PER, Tr. 36:19–20, is plainly not the same as reconvening the SSEB to evaluate proposals a second time.  The Court here in no way criticizes Mr. [DW]'s work, nor does the Court hold that agencies lack discretion to propose corrective action, including the scope of a proposed reevaluation.  Rather, the Court is merely contrasting the Agency's representation of the planned corrective action to GAO with the Agency's actual corrective action — including as it was represented in the government's briefs — to underscore the potential significance of the RM termination letter.  Oak Grove should have had the opportunity to make arguments about the possible implications of that document.

On that note, the government also contends, that "the [RM] termination letter did not present any new facts regarding the scope of corrective action performed than that contained in the original AR."  (Def. Reply at 4.) In support, the government relies on the following statement within the August 21, 2020, Memorandum for the Record from the "Source Selection Advisory Counsel Chairperson" (or "SSAC"):

> *As a result of the corrective action*, the PER was updated to reflect an accurate representation of the evaluation of the Offerors['] proposals inserting additional findings and ensuring that the findings were consistent with the evaluation criteria outlined in the solicitation.

AR 3343 (emphasis added), *quoted in* Def. Reply at 4.[24]

With the benefit of hindsight, and the RM termination letter now in hand, the Court understands how to properly read that summary.  But, standing alone, that statement is ambiguous insofar as it suggests that updates to the PER were made "[a]s *a result of* the corrective action" — implying the updates followed a reevaluation.  AR 3343 (emphasis added).  In light of the Agency's commitment to GAO that the Agency would complete a reevaluation, and given the government's assertion in its brief that the Agency reconvened the SSEB, the Court reasonably (but obviously incorrectly) read the SSAC's memorandum as asserting that the PER was updated only after a complete reevaluation process.  Again, whether deliberately or not, the Court was misled by the omission of the RM termination letter.  The nature of the actual corrective action only became clear once the Court heard Mr. [DW]'s explanation at the show cause hearing.

The other document in the administrative record upon which the government relies — the August 28, 2020, Source Selection Decision Document ("SSDD") — suffers from a similar ambiguity.  The SSDD notes that "the PCO initiated corrective actions

---

[24] The government (*see* Def. Reply at 4) mistakenly cites AR 3349–50, which is the Source Selection Decision Document, not the referenced SSAC Chairperson's Memorandum.

*and* arranged for an independent review of the evaluation."  AR 3350 (emphasis added) (quoted in Def. Reply at 4).[25]  If anything, this makes it appear as if the Agency conducted a new, second evaluation — consistent with the corrective action promised to the GAO — and then, only after that reevaluation, arranged for an independent review of *that* second evaluation.  Indeed, the SSDD indicates that a new contract award decision was made only "[a]fter a full review of the evaluation results from the SEEB members *and my independent review* of the evaluation documentation[,]" further suggesting that there was a full reevaluation and an independent review by the SSDD's author.  AR 3350 (emphasis added).  In other words, the phrase "my independent review" refers to one the Source Selection Authority conducted, leading readers away from understanding that the first referenced "independent review" *was itself* the corrective action conducted by the new SSEB Chairperson, Mr. [DW].  Moreover, the SSDD indicates that the new, final award decision is "[b]ased on the findings presented to the SSAC and Final SSEB PER," and that "the SSAC independently reviewed and compared *the results of the SSEB evaluation* and determined it was conducted in accordance with the factors set forth and the evaluation criteria in the solicitation . . . ." AR 3371 (emphasis added).  Of course, not until the hearing on the show cause order did the Court learn that the SSEB was not reconvened or otherwise reconstituted — as noted, *supra*, several of the original evaluators were unavailable and were not reengaged.

More significantly, as counsel for Oak Grove argued, the limited corrective action implemented was entirely inappropriate where, as here, the SSEB Chairperson was removed "mid-corrective action" for "competency issues" and then, rather than "dump the PER" or "convene new people to conduct a new evaluation," the Agency continued "writing on [RM's] slate."  Tr. 68:17 – 69:4.  The Court agrees with Oak Grove:

> At the end of the day, . . . [t]hey're working off [RM's] memo.  They're working off his sheet.  They're adjusting here; they're adjusting there.  [But,] [t]his is not a new evaluation.

Tr. 69:4–9.  Accordingly, the Court rejects the government's assertion that "[RM] played no role in the second evaluation"; indeed, the only way this assertion is possibly true is

---

[25] Similarly, the Court notes that in the Agency's GAO brief in the protest proceedings following the putative corrective action, the Agency represented that it "re-evaluated proposals as part of the corrective action consistent with the evaluation criteria set forth in the Solicitation *and* arranged for an independent review of the evaluation."  AR 975 (emphasis added).  The Agency's representation to the GAO concerning the nature of the corrective action would lead an uninformed reader to believe that there were two steps to the corrective action: (1) a reevaluation of proposals; *and* (2) an independent review of that evaluation.  In fact, however, it turns out that the "independent review" *was* the reevaluation.

if the phrase "second evaluation" is read exceedingly narrowly to mean just the sign-off on the final revised SSEB recommendation.[26]  Def. Reply at 7.  But even if that were a reasonable way to characterize what happened, it would not excuse the Agency's failure to include the RM termination letter in the administrative record.

    In sum, the Court concludes that the RM termination letter "was a relevant document to the matter" and that both Oak Grove and the Court were harmed by the Agency's failure to include it in the initial record.  Tr. 49:5–8 ("But at the end of the day, [RM] was removed.  Everybody in this process knew it and they kept it from [plaintiff's counsel], they kept it from GAO, they kept it from this Court.").  At a minimum, the Agency's failure to include the RM termination letter in the administrative record — when combined with various assertions in the briefs and other documents in the record — had the effect of concealing RM's true role in the procurement and the precise nature of the corrective action.  *Cf. Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1075 (Fed. Cir. 2002) ("Advancing even a single invalid theory forces the defendant to respond and to do work it should not have been required to do.").  There is no question that, without the RM termination letter, the Court would not have the clear picture it now has regarding the true nature of the corrective action.

---

[26] The government points to AR 3530 for the proposition that the "existing AR plainly showed" that "[RM] had no involvement in the August 2020 re-evaluation and award."  Def. Reply at 7 (citing AR 3530, AR 3885–86).  But AR 3530 is a declaration (made under penalty of perjury) from RM's second-line supervisor, submitted to the GAO, representing that she "saw no indications that [RM] acted improperly during the source selection process" but that "for un-related reasons, [she] had another Government employee conduct an independent evaluation of the proposals for [the procurement] which resulted in the updated Proposal Evaluation Report."  AR 3530.  The supervisor's declaration omits that RM was removed from his position as SSEB Chairperson, omits that he played a role in the corrective action process (whatever that entailed), and certainly would lead a reader to believe that there was an entirely new "evaluation of the proposals" — something that did not happen.  As Mr. [DW] made clear, his "independent" review did not consist of a wholesale reevaluation, but rather was focused on the quality of the PER to ensure it aligned with the extant evaluations performed by evaluators — former SSEB members — that were not reconvened because they were no longer available.  The other cited document is the second award notification letter to Oak Grove, *see* AR 3884–3886.  It, too, does not disclose anything about the mechanics of the supposed reevaluation or RM's involvement in the putative corrective action.  With the benefit of the RM termination letter, we now know that when the government told Oak Grove that "the Government conducted an independent review of the individual evaluations to ensure that all of the evaluations and findings were assessed in accordance with the solicitation procedures," that did *not* mean the Agency had performed a reevaluation.  AR 3885.

## VII.   CONCLUSION

For all the above reasons, and pursuant to RCFC 11, the Court concludes that the United States must pay the legal costs and expenses Oak Grove incurred in dealing with the administrative record issues that were the subject of the Court's show cause order. The Agency's failure to include the omitted documents was neither reasonable nor excusable — it was, rather, an improper compilation, submission, and certification of the administrative record.  The omissions delayed resolving this case, wasted the Court's judicial resources by forcing the Court to engage in fact finding on an incomplete record, and imposed substantial costs on Oak Grove.

Counsel for Oak Grove and the government are directed to meet-and-confer in good faith regarding those costs and submit a joint status report on or before November 19, 2021, indicating whether they have reached an agreement on a fair and reasonable sum, or detailing their respective positions if the parties are unable to reach an agreement.  A fair and reasonable sum will include costs incurred in reviewing, responding to, preparing for, or participating in (as applicable):  (1) the supplemental administrative record filings (made after the merits briefing and following oral argument); (2) related orders of this Court; (3) related supplemental briefs; and (4) related status conferences and the show cause hearing.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge